## No. 13-4178

_____

In the United States Court of Appeals for the Tenth Circuit
_____

DEREK KITCHEN, et al.,

Plaintiffs-Appellees,

v.

GARY R. HERBERT, in his official capacity as Governor of Utah, and
SEAN D. REYES, in his official capacity as Attorney General of Utah,

Defendants-Appellants,

and

SHERRIE SWENSON, as Salt Lake County Clerk,

Defendant.

_____

On appeal from the U.S. District Court for the District of Utah,
The Honorable Robert J. Shelby presiding, Case No. 2:13-CV-00217 RJS
_____

### Brief of Appellants Gary R. Herbert and Sean D. Reyes
_____

JOHN J. BURSCH
Warner Norcross & Judd LLP
111 Lyon Street, NW. Ste. 900
Grand Rapids, MI 49503
616-752-2474

MONTE N. STEWART
12550 W. Explorer Dr., Ste. 100
Boise, ID 83713
208-345-3333

GENE C. SCHAERR
Special Assistant Attorney
General
BRIAN L. TARBET
Chief Deputy Attorney General
PARKER DOUGLAS
Chief of Staff & Counsel General
160 East 300 South
Salt Lake City, UT 84114-0856
801-366-0100 (phone)
gschaerr@utah.gov

**ORAL ARGUMENT REQUESTED**

## ADDITIONAL COUNSEL

STANFORD E. PURSER
PHILIP S. LOTT
Asst. UT Attorneys General
160 East 300 South
Salt Lake City, Utah 84114-0856
801-366-0100

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................iv

PRIOR OR RELATED APPEALS........................................................xiv

INTRODUCTION............................................................................1

JURISDICTION...............................................................................4

ISSUE PRESENTED.........................................................................4

FACTUAL AND PROCEDURAL STATEMENT.....................................4

    A.    The States' traditional authority over marriage..........................4

    B.    History of the man-woman definintion......................................7

    C.    History of Amendment 3........................................................10

    D.    Other Utah laws encouraging mother-father parenting............14

    E.    Recent experimentation in other States..................................17

    F.    Procedural history of this case...............................................17

    G.    The district court's decision..................................................18

    H.    Stay proceedings..................................................................21

SUMMARY OF ARGUMENT............................................................22

STANDARD OF REVIEW.................................................................28

ARGUMENT..................................................................................28

    THE DISTRICT COURT ERRED IN HOLDING THAT UTAH
    LACKS CONSTITUTIONAL AUTHORITY TO RETAIN ITS
    GENDERED DEFINITION OF MARRIAGE...................................28

    A.    The district dourt's decision contravenes *Baker v. Nelson*, which
        is both controlling and consistent with *Windsor* and the
        federalism principles it reaffirms. ...........................................28

        1.    *Baker* is controlling. ...........................................................29

        2.    The district court's reasons for refusing to follow *Baker* are
            misguided. ..........................................................................32

B.   Viewed in light of the proper legal standards, the district court's due process and equal protection holdings are legally erroneous. ...................................................................................................36

  1.   There is no fundamental due-process right to marry someone of the same sex. ..................................................................37

  2.   Under the district court's own conclusions about the legitimate purposes of Utah's definition, Utah does not deny same-sex couples the equal protection of the laws. ..............42

C.   The district court erred in failing to give adequate weight to Utah's reasons, supported by common sense and substantial social science, for retaining the man-woman definition of marriage. ......................................................................................50

  1.   Utah's marriage definition furthers the State's vital interest in fostering a child-centric marriage culture that encourages parents to subordinate their own interests to the needs of their children. .......................................................................51

  2.   Utah's marriage definition furthers the State's vital interest in children being raised by their biological mothers and fathers—or at least by a married mother and father—in a stable home. ..........................................................................62

  3.   Utah's man-woman definition furthers the State's vital interest in ensuring adequate reproduction by parents willing and able to provide a high-quality home environment for their children. .................................................................82

  4.   Preserving Utah's marriage definition furthers the State's vital interests in accommodating religious freedom and reducing the potential for civic strife. ...................................90

CONCLUSION ...................................................................................101

STATEMENT REGARDING ORAL ARGUMENT ..............................101

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................103

ECF CERTIFICATIONS ....................................................................103

CERTIFICATE OF SERVICE .............................................................104

ADDENDA ........................................................................................105

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200 (1995) ..................... 44

*Andersen v. King Cnty.*, 138 P.3d 963 (Wash. 2006) ........................ 37, 38

*Baker v Nelson,* 409 U.S. 810 (1972) .................................... 18, 22, 23, 28

*Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971) ............................. passim

*Baker v. State,* 744 A.2d 864 (Vt. 1999) .......................................... 12, 45

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731 (1983) .. 90, 97

*Bob Jones University v. United States*, 461 U.S. 574 (1983) .................. 95

*Bowen v. Gilliard*, 483 U.S. 587 (1987) ................................................. 66

*Christian Heritage Acad. v. Okla. Secondary Sch. Ass'n,* 483 F.3d 1025 (10th Cir. 2007) ................................................................. 28

*Citizens for Equal Prot.* v. *Bruning*, 455 F.3d 859 (8th Cir. 2006) ... 31, 43

*City of Dallas v. Stanglin*, 490 U.S. 19 (1989) ...................................... 46

*Clinton v. City of New York*, 524 U.S. 417 (1998) .................................. 35

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992) .......................... 37

*Craig* v. *Boren*, 429 U.S. 190 (1976) ...................................................... 44

*Davis* v. *Prison Health Servs.*, 679 F.3d 433 (6th Cir. 2012) .................. 43

*Dean v. District of Columbia*, 653 A.2d 307 (D.C. 1995) .................. 38, 43

*Donaldson v. State*, 292 P.3d 364 (Mont. 2012) .................................... 31

*Elane Photography, LLC v. Willock*, 309 P.3d 53 (N.M. 2013) .............. 95

*Ex parte Burrus*, 136 U.S. 586 (1890) ..................................................... 5

*F.C.C v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ............................. 46

*Gonzales v. Carhart*, 550 U.S. 124 (2007)........................................ 41, 65

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ................................................ 36

*Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941 (Mass. 2003) .......... 12

*Haddock v. Haddock*, 201 U.S. 562 (1906) ................................................ 5

*Hernandez v. Robles*, 855 N.E.2d 1 (N.Y. 2006) ............................ passim

*Hicks v. Miranda*, 422 U.S. 332 (1975) ................................................... 29

*Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979) ....................................... 5

*Hyde v. Hyde*, [L.R.] 1 P. & D. 130 (1866) (Lord Penzance) .................. 11

*In re Kandu,* 315 B.R. 123 (Bankr. W.D. Wash. 2004) ........................... 43

*In re Marriage of J.B. & H.B.,* 326 S.W.3d 654 (Tex. App. 2010) .......... 43

*Jackson v. Abercrombie*, 884 F. Supp. 2d 1065 (D. Haw. 2012) . 38, 43, 47

*Johnson v. Robison,* 415 U.S. 361 (1947)......................................... 25, 47

*Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000) .............................. 49

*Lawrence v. Texas*, 539 U.S. 558 (2003)........................................... 33, 40

*Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U.S. 356 (1973)........... 46

*Lewis v. Harris*, 908 A.2d 196 (N.J. 2006) ....................................... 37, 59

*Lofton* v. *Secretary of the Dep't of Children & Family Servs.*, 358 F.3d
     804 (11th Cir. 2004) ...................................................................... 43, 50

*Loving v. Virginia,* 388 U.S. 1 (1967)................................... 9, 27, 39, 84

*Maher v. Roe*, 432 U.S. 464 (1977) ...................................................... 100

*Mandel v. Bradley*, 432 U.S. 173 (1977) ................................... 23, 29, 30

*Marcavage v. City of New York*, 689 F.3d 98 (2d Cir. 2012).................. 62

*Massachusetts v. U. S. Dep't Health & Human Servs.*, 682 F.3d 1 (1st Cir. 2012) .................................................................................... 31

*Maynard v. Hill,* 125 U.S. 190, 211 (1888) ............................................. 84

*Morrison v. Sadler*, 821 N.E.2d 15 (Ind. Ct. App. 2005) ........................ 43

*Murphy v. Ramsey,* 114 U.S. 15 (1885) ........................................... 8, 100

*Nordlinger* v. *Hahn*, 505 U.S. 1 (1992) ........................................... 46, 51

*Padula* v. *Webster*, 822 F.2d 97 (D.C. Cir. 1987) ................................... 44

*Parham v. J.R.*, 442 U.S. 584 (1979) ...................................................... 65

*Phillips Chemical Co.* v. *Dumas School Dist.*, 361 U.S. 376 (1960) ....... 48

*Price-Cornelison* v. *Brooks*, 524 F.3d 1103 (10th Cir. 2008) ............. 43, 44

*Rodriquez de Quijas* v. *Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989) ................................................................................................ 23, 32

*Romer v. Evans*, 517 U.S. 620 (1996) .................................................... 42

*Rose v. Rose*, 481 U.S. 619 (1987) ........................................................... 5

*Simms v. Simms*, 175 U.S. 162 (1899) ..................................................... 5

*Skinner v. Oklahoma,* 316 U.S. 535 (1942) .......................................... 9, 84

*Smithkline Beecham Corp. v. Abbott Labs*, __ F.3d __, 2014 WL 211807 (9th Cir., January 21, 2014) ............................................................... 44

*Sosna v. Iowa*, 419 U.S. 393 (1975) .................................................... 5, 34

*Stenberg v. Carhart*, 530 U.S. 914 (1999) ............................................. 41

*United States v. Griffin*, 7 F.3d 1512 (10th Cir. 1993) ........................... 62

*United States v. Windsor*, 133 S. Ct. 2675 (2013) ........................... passim

*United States v. Yazell,* 382 U.S. 341 (1966) ........................................... 5

*Van Orden v. Perry,* 545 U.S. 677 (2005) .............................................. 97

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) .......................................... 96

*Washington v. Glucksberg,* 521 U.S. 702 (1997) ............................ passim

*Zablocki v. Redhail,* 434 U.S. 374 (1978)........................... 9, 39, 84

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002).................................. 97

**State Statutes**

Utah Code § 30-1-2(5)................................................................ 11

Utah Code § 30-1-30 ................................................................. 15

Utah Code § 30-1-4.1 ............................................................... 12

Utah Code § 30-3-11.3 ..............................................................57

Utah Code § 62A-4a-103(2)(b)................................................... 15

Utah Code § 62A-4a-107(5)(a) and (b) ...................................... 15

Utah Code § 62A-4a-201(1)(c) ................................................... 15

Utah Code § 62A-4a-203(1)(a) ................................................... 15

Utah Code § 62A-4a-607(1)(b) ................................................... 17

Utah Code § 68-3-1 ................................................................... 10

Utah Code § 78A-6-102(5)(g) .................................................... 16

Utah Code § 78A-6-302 ..............................................................57

Utah Code § 78A-6-503(10)(d) ................................................... 16

Utah Code § 78A-6-503(8) ......................................................... 16

Utah Code § 78B-6-102(4) ......................................................... 16

Utah Code § 78B-6-117(2) ......................................................... 16

Utah Code § 78B-6-117(3) ......................................................... 16

Utah Code § 78B-6-117(4) ......................................................... 17

## Constitution

UTAH CONST. art. III .................................................................... 10

## Other Sources

A.R. Radcliffe-Brown, *Structure and Function in Primitive Society* 10
(1952) ..................................................................... 53, 57

Allan Carlson, *Deconstruction of Marriage: The Swedish Case*, 44 San
Diego L. Rev. 153 (2007) ............................................... 80

*Amicus Curie Brief of Scholars of History and Related Disciplines*, No.
12-144, U.S. Supreme Court ................................................ 7

Andrew J. Cherlin, *The Deinstitutionalization of American Marriage*, 66
J. Marriage & Fam. 848 (2004) ......................................... 75

Ass'n of Religion Data Archives .............................................. 91

Benjamin Scafidi, Institute for American Values, *The Taxpayer Costs of
Divorce and Unwed Childbearing: First-Ever Estimates for the Nation
and All Fifty States* (2008) ............................................... 69

Bertrand Russell, *Marriage & Morals* (Liveright 1970) ...................... 56

Bronislaw Malinowski, *Sex, Culture, and Myth* (1962) ...................... 53

Bruce J. Ellis et. al *Does Father Absence Place Daughters at Special
Risk for Early Sexual Activity and Teenage Pregnancy?*, 74 Child Dev.
801 (2003) .................................................................. 66

Carl E. Schneider, *The Channeling Function in Family Law*, 20 Hofstra
L. Rev. 495 (1992) .......................................................... 55

Cent. Intelligence Agency, *Country Comparison: Birth Rate*, The World
Factbook .................................................................. 85, 86

Cent. Intelligence Agency, *Country Comparison: Total Fertility Rate*,
The Word Factbook ....................................................... 85, 86

Clarence Page, *An odd push to privatize marriage*, Chicago Tribune
(April 3, 2013) ............................................................. 78

Claude Levi-Strauss, *Introduction, in A History of the Family: Distant Worlds, Ancient Worlds* .......................................................................10

Claude Levi-Strauss,*The View From Afar* (1985).....................................10

Ctrs. for Disease Control & Prevention, *Marriage Rates by State: 1990, 1995, and 1999-2011* ...........................................................................80

Ctrs. For Disease Control and Prevention, *National Vital Statistics Reports—Births: Final Data for 2010* (Aug. 28, 2012) ..................85, 86

Cynthia C. Harper and Sara S McLanahan, *Father Absence and Youth Incarceration,* 14 J. Res. Adolescence 369 (2004) ................................68

Dan Fastenberg, *A Brief History of International Gay Marriage*, Time, July 22, 2010 ......................................................................................86

Daniel Avila, *Same-Sex Adoption in Massachusetts, the Catholic Church, and the Good of the Children: The Story Behind the Controversy and the Case for Conscientious Refusals* 27 Children's Legal Rights J. 1 (2007) ....................................................................95

David Popenoe, *Life Without Father: Compelling New Evidence That Fatherhood & Marriage are Indispensable for the Good of Children & Society* (1996).......................................................................................64

Dean Byrd, *Dual-Gender Parenting: A Social Science Perspective for Optimal Child Rearing, in Family Law: Balancing Interests and Pursing Priorities* (2007) ........................................................................65

Dean Byrd, *Gender Complementarity and Child-reading: Where Tradition and Science Agree,* 6 J. L. & Fam. Studs. 213 (2004) .........65

Douglas W. Allen, *High School Graduation Rates Among Children of Same-sex Households* 11 Rev. Econ. Household 635 (2013)................67

Eerik Lagerspetz, *On the Existence of Institutions, in On the Nature of Social and Institutional Reality* (Eerik Lagerspetz et al. eds., 2001).54

Eerik Lagerspetz, *The Opposite Mirrors: An Essay on the Conventionalist Theory of Institutions* (1995) .....................................54

Ellen Willis, *Can Marriage Be Saved?* A Forum, The Nation (2004) .... 77

Emily Esfahani Smith, *Washington, Gay Marriage and the Catholic Church*, Wall Street Journal (Jan. 9, 2010).......................................... 94

European Commission, *Crude Marriage Rate, Selected Years, 1960-2011* ................................................................................................................ 79

Froma Harrop, *Take Government out of the Marriage Business*, Real Clear Politics (July 2, 2013) .................................................................. 78

G. Robina Quale, *A History Of Marriage Systems* (1988) ....................... 53

Institute for American Values, *Marriage and the Law: A Statement of Principles* (2006)................................................................................ 59, 61

International Social Survey Programme, *Family and Changing Gender Roles III: 2002* (September 2004).......................................................... 79

James Q. Wilson, *The Marriage Problem* (2002) .................................... 53

Jean-Pierre Guengant, *The Proximate Determinants During the Fertility Transition*.......................................................................... 83, 84

Joel Prentiss Bishop, *Commentaries on the Law of Marriage & Divorce* Vol. 1 (1st ed. 1852) .............................................................................. 8

John Bouvier, A Law Dictionary Adapted to the Constitution and Laws of the United States (1856) .................................................................... 8

John Garvey, *State Putting Church Out of Adoption Business,* Boston Globe (March 14, 2006) ...................................................................... 95

John R. Searle, *Making the Social World: The Structure of Human Civilization* (2010) ............................................................................ 54

John R. Searle, *The Construction of Social Reality* (1995).................... 54

Joseph E. Worcester, *A Primary Dictionary of the English Language* (1871) .................................................................................................... 8

Joyce A. Martin, et al., Ctrs. for Disease Control & Prevention, *National Vital Statistics Reports—Births: Final Data for 2012* (December 30, 2013) ............................................................................................84

Judith Stacey, *In the Name of the Family:  Rethinking Family Values in the Postmodern Age* (1996)................................................................77

Junfu Zhang and Xue Song, *Fertility Differences between Married and Cohabiting Couples: A Switching Regression Analysis*, IZA Discussion Paper No. 3245 (December 2007).........................................................89

Keith Ablow, *When It Comes to Marriage, Government Should Divorce Itself*, Fox News (March 27, 2013) ........................................................79

Kristin Anderson Moore et al., *Marriage From a Child's Perspective: How Does Family Structure Affect Children and What Can We Do About It*, Child Trends Research Brief (June 2002) ......................63, 66

Lawrence L. Wu & Brian C. Martinson, *Family Structure and the Risk of a Premarital Birth*, 54 American Sociological Rev. 210 (1993).......67

Letter from Douglas Laycock, Michael Perry, and Mark D. Stern to Representative Michael Madigan (Mar. 11, 2013) ..............................94

Loren D. Marks, *Same-Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting*, 41 Soc. Sci. Research 735 (2012) ......77

Lynn D. Wardle, *The Fall of Marital Stability and the Rise of Juvenile Delinquency,* 10 J. L. & Fam. Studs. 83 (2007) ...................................68

Lynn Wardle, *"Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation*, 24 Harvard J. L. & Pub. Pol'y 771(2001)...........................................82, 83

Manya A. Brachearm, *Rockford Catholic Charities Ending Foster Care,* Chicago Tribune (May 26, 2011).........................................................95

Mark D. Regnerus, *Answering Critics of the New Family Structures Study with Additional Analysis,* 41 Soc. Sci. Res. 1367 (2012)...........68

Mark D. Regnerus, *How Different Are the Adult Children of Parents Who Have Same-Sex Relationships? Findings from the New Family Structures Study*, 41 Soc. Sci. Res. 752 (2012) ............................... 68, 76

Michael E. Lamb, Fathers: *Forgotten Contributors to Child Development*, 18 Human Development 245 (1975) ............................... 65

Michelle Boorstein, *Citing Same-Sex Marriage Bill, Washington Archdiocese Ends Foster-Care Program*, Washington Post (Feb. 17, 2010) ........................................................................................ 94

Monte Neil Stewart, *Genderless Marriage, Institutional Realities, and Judicial Elision*, 1 Duke J. Const. L. & Pub. Pol'y 1 (2006) ......... 54, 55

Monte Neil Stewart, *Marriage Facts*, 31 Harv. J.L. & Pub. Pol'y 313 (2008) .......................................................................................... 54

Noah Webster, *Etymological Dictionary* (1st ed. 1869) ............................ 8

Norval D. Glenn, *The Struggle for Same-Sex Marriage*, 41 Soc'y 25 (2004) ................................................................................... 64, 74

OECD, Social Policy Division, Directorate of Employment, Labour and Social Affairs, *SF2.1: Fertility rates*, OECD Family Database (June 26, 2013) ...................................................................................... 85

Patrick J. Borchers, Baker v. General Motors: *Implications for Interjurisdictional Recognition of Non-Traditional Marriages*, 32 Creighton L. Rev. 147 (1998) ................................................................ 49

Pew Research Religion & Pub. Life Project, *Religious Groups' Official Positions on Same-Sex Marriage* (Dec. 7, 2012) ............................ 91, 92

Press Release, *Congressman Bob Barr's Remarks at 2011 Log Cabin National Convention* (April 30, 2011) ................................................. 78

Raj Chetty et. al, *Where is the Land of Opportunity? The Geography of Intergenerational Mobility in the U.S., Table IV,* NBER Working Paper No. 19843 (January 2014) ......................................................... 71

*Religious Establishment Bigots Sound Alarm Against Loving Same-Sex Marriages*, The Daily Kos (Jan. 12, 2012) ........................................... 95

Richard G. Wilkins, *Adult Sexual Desire and the Best Interests of the Child,* 18 St. Thomas L. Rev. 543 (2005) ............................................. 68

Robert George et al., *What is Marriage? Man and Woman: A Defense* (2012) ....................................................................................... 52

*Same-Sex Marriage and Religious Liberty: Emerging Conflicts* (Douglas Laycock et al. eds., 2008) .................................................... 94

*Sex, Marriage and Family in World Religions* (Don S. Browning, M. Christian Green & John Witte, Jr. eds., 2009).................................... 93

Stephanie Weiland Bowling & Ronald J. Werner-Wilson, *Father-Daughter Relationships and Adolescent Female Sexuality: Paternal Qualities Associated with Responsible Sexual Behavior* 3 J. HIV/AIDS Prevention & Educ. Adolescents & Child. 5 (2003) ............................. 67

*Teacher, School Sued Over Gay Fairy Tale*, NPR (April 27, 2006) ........ 96

*The Meaning and Significance of Marriage in Contemporary Society, in Contemporary Marriage: Comparative Perspectives on a Changing Institution* (Kingsley Davis ed., 1985) ................................................... 7

Todd Starnes, *Atty Says School Threatened, Punished Boy Who Opposed Gay Adoption*, Fox News Radio............................................................. 96

Todd Starnes, *Christian Teacher Under Investigation for Opposing Homosexuality*, Fox News Radio (Oct. 19, 2011) ................................. 96

W. Bradford Wilcox et al., Institute for American Values, *Why Marriage Matters: Thirty Conclusions from the Social Sciences* 20 (3rd ed. 2011) ....................................................................................... 53

William Blackstone, *Commentaries*.................................................... 7, 65

Witherspoon Institute, *Marriage and the Public Good: Ten Principles* (2008) ........................................................................... 64, 66, 72

## PRIOR OR RELATED APPEALS

*Bishop v. Smith,* No. 14-5003, pending in this Court, involves a constitutional challenge to Oklahoma's definition of marriage as only the union between a man and a woman.

Additionally, there is a pending appeal in the United States Court of Appeals for the Ninth Circuit addressing the constitutionality of Nevada's definition of marriage. *Sevcik v. Sandoval,* No. 12-17668.

## INTRODUCTION

As with other issues of domestic-relations law, choosing a definition of marriage in today's world presents a clash between deeply held interests and values. On one hand are the interests of Utah citizens who have formed intimate, committed relationships with someone of the same sex—and in some cases are raising or wish to raise children together—and who want the State to confer on them the benefits of marriage. The State respects and values those citizens and their children as both equal before the law and fully entitled to order their private lives in the manner they have chosen.

On the other hand are the long-term interests of all Utah's children—both now and in future generations. They cannot defend their own interests. The State thus has a duty to consider their interests in deciding whether to abandon the man-woman definition of marriage. And Utah voters, in enacting the constitutional amendment known as Amendment 3, reaffirmed among other things their firm belief—also supported by sound social science—that moms and dads are different, not interchangeable, and that the diversity of having both a mom and a dad is the ideal parenting environment.

That model is not intended to demean other family structures, any more than giving an "A" to some students demeans others.    As between mutually exclusive models of marriage, the man-woman model is simply the one the State and its people believe is best for children.

What makes the decision about redefining marriage particularly poignant is not merely the uncertainty inherent in predicting its long-term effects.  It is also the mounting evidence that such a redefinition poses real, concrete risks to children—especially in future generations. Many of those risks flow from the inevitable effect of shifting the public meaning of marriage away from a largely child-centric institution—what Justice Alito (without disagreement from the other Justices) called a "conjugal" view of marriage—and toward a more adult-centric or "consent-based" view. *See United States v. Windsor*, 133 S. Ct. 2675, 2718 (2013) (Alito, J, dissenting).  As detailed below, the specific long-term risks to children include:

> (1) a risk of increased self-interest in parental decision-making on a range of issues, including recreation, career choices and romantic relationships;
>
> (2) a risk of increased fatherlessness (and motherlessness), with all the emotional, social and economic damage that has been shown to create; and

(3) a risk of reduced birthrates, with the demographic and economic crises that could bring.

Given the stakes, the State has important and compelling interests in—and certainly a rational basis for—minimizing each of those risks.

Determining the proper balance between competing interests in the marriage debate falls squarely within what the Supreme Court in *Windsor* called the States' "broad[ ] authority to regulate the subject of domestic relations . . . ." *United States v. Windsor,* 133 S. Ct. 2675, 2690 (2013). Different states have struck a different balance than Utah's, and *Windsor* held that choice is protected by the States' "historic and essential authority to define the marital relation" free from "federal intrusion." *Id.* at 2692. Yet States like Utah that decide to place greater weight on the benefits to *children* of retaining the gendered definition of marriage are entitled to the same deference and respect. Anything less would effectively federalize domestic relations law.

Because the district court did not give proper deference to the choice of Utah's citizens, the State requests that this Court reverse.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343(3). That court's decision was entered on December 20, 2013. Memorandum Decision and Order ("Decision") at 53, attached as Addendum 1. That same day, Utah's Governor and Attorney General ("State Defendants") filed a notice of appeal. App. 2770. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether the Fourteenth Amendment's Equal Protection Clause or its Due Process Clause requires Utah to change its definition of marriage from the union of a man and a woman to the union of two persons.

Preservation:    The State raised this issue throughout its summary judgment briefing. App. 108-178.

## FACTUAL AND PROCEDURAL STATEMENT

### A.        The States' traditional authority over marriage

In cases spanning three centuries, the Supreme Court has emphasized that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *Ex parte Burrus*, 136 U.S.

4

586, 593-94 (1890); *Simms v. Simms*, 175 U.S. 162, 167 (1899) (same);
*Rose v. Rose*, 481 U.S. 619, 625 (1987) (same); 133 S. Ct. at 2691
(quoting *Burrus*). The States' power to define marriage flows from the
fact that "[t]he states, at the time of the adoption of the Constitution,
possessed full power over the subject of marriage and divorce . . . . [and]
the Constitution delegated no authority to the government of the
United States on the subject ." *Haddock v. Haddock*, 201 U.S. 562, 575
(1906), *overruled on other grounds, Williams v. North Carolina,* 317
U.S. 287 (1942).

Thus, marriage and domestic relations is "an area that has long
been regarded as a virtually exclusive province of the States." *Sosna v.
Iowa*, 419 U.S. 393, 404 (1975). And Supreme Court precedent over the
years has taught "solicitude for state interests, particularly in the field
of family and family-property arrangements." *United States v. Yazell,*
382 U.S. 341, 352 (1966). Indeed, "[i]nsofar as marriage is within
temporal control, the States lay on the guiding hand." *Hisquierdo v.
Hisquierdo*, 439 U.S. 572, 581 (1979).

In *Windsor*, the Supreme Court reaffirmed the States' traditional
authority over marriage. 133 S. Ct. at 2691. In declaring § 3 of the
federal Defense of Marriage Act unconstitutional, the Court emphasized

the States' "historic and essential authority to define the marital
relation," on the understanding that "[t]he definition of marriage is the
foundation of the State's broader authority to regulate the subject of
domestic relations with respect to the '[p]rotection of offspring, property
interests, and the enforcement of marital responsibilities.'" *Id.* at 2692,
2691 (quoting *Williams*, 317 U.S. at 298 (alteration in original)).  The
Court further noted that, "[c]onsistent with this allocation of authority,
the Federal Government, through our history, has deferred to state-law
policy decisions with respect to domestic relations." *Id.* at 2691.
Specifically, the Court held that New York's recognition of same-sex
marriage was "without doubt a proper exercise of its sovereign
authority within our federal system, all in the way that the Framers of
the Constitution intended." *Id.* at 2692.  Congress went astray there,
the Court held, by "interfer[ing] with the equal dignity of same-sex
marriages … conferred by the States in the exercise of their sovereign
power." *Id.* at 2693.

## B.        History of the man-woman definintion

The understanding of marriage as a union between a man and a woman and its purpose of uniting members of the opposite sex and their children into family units recognized by society was, until recently, universally accepted by courts, legal scholars, philosophers and sociologists.  *See, e.g.,* 1 William Blackstone, *Commentaries* \*422 (describing the relationship between parent and child as "consequential to that of marriage, being its principal end and design: and it is by virtue of this relation that infants are protected, maintained, and educated").  In the words of sociologist Kingsley Davis:

> The family is the part of the institutional system through which the creation, nurture, and socialization of the next generation is mainly accomplished…. The genius of the family system is that, through it, the society normally holds the biological parents responsible for each other and for their offspring.  By identifying children with their parents … the social system powerfully motivates individuals to settle into a sexual union and take care of the ensuing offspring.[1]

---

[1] *The Meaning and Significance of Marriage in Contemporary Society, in Contemporary Marriage: Comparative Perspectives on a Changing Institution* 7-8 (Kingsley Davis, ed. 1985) App. 1043-1044; *see also Amicus Curie Brief of Scholars of History and Related Disciplines* at 11-22, Case 12-144, U.S. Supreme Court; App. 292-296.

This historic understanding was reflected in prominent dictionaries from the time of the Fourteenth Amendment's framing and ratification.[2]   Indeed, the country's leading expert on family law during that era opined that: "[m]arriage between two persons of one sex could have no validity, as none of the ends of matrimony could be accomplished thereby.  It has always, therefore, been deemed requisite to the entire validity of every marriage … that the parties should be of different sex."[3]

The Supreme Court has taken the same view:

> [C]ertainly, no legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth, fit to take rank as one of the co-ordinate states of the Union, than that which seeks to establish it on the basis of the idea of the family, *as consisting in and springing from the union for life of one man and one woman* . . . .

*Murphy v. Ramsey,* 114 U.S. 15, 45 (1885) (emphasis added).

More recently, the Supreme Court has continued to acknowledge

---

[2] *E.g.*, Noah Webster, *Etymological Dictionary* 130 (1st ed. 1869); ; Joseph E. Worcester, *A Primary Dictionary of the English Language* 176 (1871); ; John Bouvier, A Law Dictionary Adapted to the Constitution and Laws of the United States 105 (1856).

[3] Joel Prentiss Bishop, *Commentaries on the Law of Marriage & Divorce* Vol. 1 at 175 (1st ed. 1852)

the historical roots and societal importance of man-woman marriage.
*See, e.g., Zablocki v. Redhail*, 434 U.S. 374, 386 (1978) (Marriage "is the
foundation of the family in our society. . . . [I]f appellee's right to
procreate means anything at all, it must imply some right to enter the
only relationship in which the State of Wisconsin allows sexual
relations legally to take place."); *Loving v. Virginia,* 388 U.S. 1, 13
(1967)  ("Marriage is one of the 'basic civil rights of man,' fundamental
to our very existence and survival."); *Skinner v. Oklahoma,* 316 U.S.
535, 541 (1942) ("Marriage and procreation are fundamental to the very
existence and survival of the race.").  Indeed, just last year the Supreme
Court reiterated that until recently, "marriage between a man and a
woman no doubt had been thought of by most people as essential to the
very definition of that term and to its role and function throughout the
history of civilization." *Windsor,* 133 S. Ct. at 2689.

This conception is not uniquely American.  Until a decade ago, "it
was an accepted truth for almost everyone who ever lived, in any society
in which marriage existed, that there could be marriages only between
participants of different sex."  *Hernandez v. Robles*, 855 N.E.2d 1, 8
(N.Y. 2006).  In the words of eminent anthropologist Claude Levi-
Strauss, "the family—based on a union, more or less durable, but

socially approved, of two individuals of opposite sexes who establish a household and bear and raise children—appears to be a practically universal phenomenon, present in every type of society." *The View From Afar* 40-41 (1985), App. 1026-1027. In short, marriage has long been understood as "a social institution with a biological foundation." 1 Claude Levi-Strauss, *Introduction, in A History of the Family: Distant Worlds, Ancient Worlds* 5 (Andre Burguiere, et al. eds., 1996).

C.     **History of Amendment 3**

The history of Utah's definition of marriage begins with a federal mandate that required Utah to limit marriage to the union of one man and one woman. To become a State, Utah had to adopt a virtually "irrevocable" State constitutional provision that "forever prohibited" polygamous marriage and thereby made adherence to monogamous marriage (at the time undoubtedly understood as between one man and one woman) the only alternative. UTAH CONST. art. III.

Since then, the State has always adhered to a definition of marriage as the union of one man and one woman and has never recognized as a marriage any other kind of relationship. Initially, at least since 1898, the State's definition was derived from adoption of the common law, Utah Code § 68-3-1 (adopting common law of England),

10

which defined marriage as "the voluntary union for life of one man and one woman, to the exclusion of all others." *Hyde v. Hyde*, [L.R.] 1 P. & D. 130 (1866) (Lord Penzance).  Over time, Utah chose to expressly codify the common-law definition of marriage.  In 1977, the legislature included on the list of prohibited and void "marriages" a union "[b]etween persons of the same sex." 1977 Utah Laws, 1st Special Session, Chap. 1, § 1 (now codified at Utah Code § 30-1-2(5)).

Subsequent legal challenges to the traditional definition of marriage in other parts of the country prompted Utah (and many other States) to enact laws and/or amend their constitutions to further protect the historic definition of marriage.  While a few scattered cases were filed earlier, in the 1990's same-sex couples began filing suits in state courts asserting that defining marriage as between one man and one woman violated their state constitutional rights.  Several state courts rejected these arguments.  App. 211.  However, some reached the opposite conclusion, ruling that their state constitutions required the state to permit single-sex marriages, or at least afford such couples the benefits of marriage.  *Id.*

In particular, the Vermont Supreme Court ruled in 1999 that Vermont had to offer all the benefits of marriage to same sex-couples,

*Baker v. State,* 744 A.2d 864, 886-87 (Vt. 1999).  That action led the

Vermont legislature to create a new legal status called "civil unions."

1999 Adj. Sess. No. 91, § 3; Vt. Stat. Ann. Tit. 15, § 23.  Likewise, the

Massachusetts Supreme Judicial Court in 2003 held that its state

constitution required the redefinition of marriage to include same-sex

unions.  *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941 (Mass.

2003).

Against this background, the 2004 Utah Legislature enacted a

provision entitled "Marriage recognition policy":

> (1)(a) It is the policy of this state to recognize as marriage
> only the legal union of a man and a woman as provided in
> this chapter.
>
> (b) Except for the relationship of marriage between a
> man and a woman recognized pursuant to this chapter, this
> state will not recognize, enforce, or give legal effect to any
> law creating any legal status, rights, benefits, or duties that
> are substantially equivalent to those provided under Utah
> law to a man and a woman because they are married.
>
> (2) Nothing in Subsection (1) impairs any contract or other
> rights, benefits, or duties that are enforceable independently
> of this section.

Utah Code § 30-1-4.1.  The statute makes plain two purposes:  (1) to

codify Utah's existing definition of marriage as between one man and

one woman, and (2) to protect the rights of any couple, including same-

sex partners, to continue to govern their relationships through enforceable private contracts.

At the same time, the Utah Legislature approved a Joint Resolution that placed a proposed constitutional amendment on the upcoming November 2004 general election ballot. The proposal, which was known as Amendment 3 and became Article 1, § 29 of the Utah Constitution, stated:

> (1) Marriage consists only of the legal union between a man and a woman.
>
> (2) No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect.

Laws 2004, H.J.R. 25 § 1, App. 191, 347.

After approval by the Utah electorate, Amendment 3 would prevent the type of judicial redefinition of marriage that had occurred in Massachusetts and Vermont. That is because the amendment provides *constitutional* protection against a state court redefinition of Utah's existing *statutory* definition of marriage, and prevents judicial attempts to side-step that definition. As explained to the voters:

> Constitutional Amendment Number 3 avoids a result in Utah similar to that of other states where state statute [defining marriage] has been determined to be in conflict with the state constitution. The Amendment raises to

> constitutional status principles relating to marriage that are now expressed only in statute.  Because the Amendment places those principles in the Utah Constitution, any potential conflict between the Utah Constitution and the statutory provision expressing the same principle is eliminated.

Utah Voter Information Pamphlet, General Election November 2, 2004, at 34, App. 347.

The proposed amendment spurred a healthy and robust public debate.  The views of both sides were well-financed, well-articulated, and well-supported by prominent political figures and scholars, as well as by business, religious, and other community leaders.  App. 327, 353-423.  The tenor of the political discourse tended toward the intellectual and legalistic—remarkable for a campaign on an issue that stirs strong and deep feelings among most citizens.  *Id.*

Utah's voters approved the constitutional amendment by a margin of 65.9% to 34.1%.  App. 322, 352.  On January 1, 2005, Amendment 3, now known as Article I, § 29, became part of the Utah Constitution.

## D.     Other Utah laws encouraging mother-father parenting

Utah's compelling interest in and commitment to children being raised by a biological mother and father, or other man-woman unions, is reflected throughout its domestic relations laws.  The State's

commitment begins even before a couple is married and any children are born.  "[T]o enhance the possibility of couples to achieve more stable, satisfying and enduring marital and family relationships," the State provides for and encourages marital counseling before a couple secures a marriage license.  Utah Code § 30-1-30.

After a couple has a child, Utah law emphasizes that "[i]t is in the best interests and welfare of a child to be raised under the care and supervision of the child's natural parents."  Utah Code § 62A-4a-201(1)(c).  Whenever possible the Division of Child and Family Services must "protect the integrity of the family."  *Id*. § 62A-4a-103(2)(b). Child-welfare-worker training emphasizes "the importance of maintaining the parent-child relationship whenever possible" and "the preference of providing in-home services" over removing a child from his or her parents. *Id*. § 62A-4a-107(5)(a) and (b).  Child welfare workers are directed to "make reasonable efforts to prevent or eliminate the need for removal of a child from the child's home" and to determine "whether there are services available" that would "eliminate the need to remove the child" from the home. *Id*. §§ 62A-4a-203(1)(a) and -202.1(3)(a).

15

The purposes of Utah's Juvenile Courts likewise include "preserv[ing] and strengthen[ing] family ties." *Id.* § 78A-6-102(5)(g). And the Juvenile Court Act specifically provides:

> It is in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents. A child's need for a normal family life in a permanent home, and for positive, nurturing family relationships is usually best met by the child's natural parents. … For these reasons, the court should only transfer custody of a child from the child's natural parent for compelling reasons and when there is a jurisdictional basis to do so.

*Id.* § 78A-6-503(8). Elsewhere the statute emphasizes that "[t]he interests of the state favor preservation and not severance of natural familial bonds . . . ." *Id.* § 78A-6-503(10)(d).

Utah adoption law similarly allows adoption only to "adults who are legally married to each other in accordance with the laws of this state," and does not permit adoption by a "single adult," *id.* § 78B-6-117(2), if that person "is cohabiting in a relationship that is not a legally valid and binding marriage under the laws of this state." *Id.* § 78B-6-117(3); *see also id.* § 78B-6-102(4). For adoptions of children in the custody of the Division of Child and Family Services, preference is

16

given to "a man and woman who are married to each other." *Id.* § 78B-6-117(4); *see also id.* § 62A-4a-607(1)(b).

### E.    Recent experimentation in other States

Most States have followed a path similar to Utah's.  Currently, 33 States define marriage as between one man and one woman, including 29 states that have a constitutional provision so providing.  Addendum 2.  Of those, 20 states have an additional constitutional provision precluding government sanction of any other marriage-like relationship. App. 205.

Same-sex marriage is legal in 17 states.  Addendum 2.  Eleven states have voluntarily authorized the marriages through the political process, almost half of them within the past year.  *Id.*  The other six States that allow same-sex marriages were compelled to do so by judicial decision.  *Id.*

### F.    Procedural history of this case

Plaintiffs are three same-sex couples.  App. 71-73.  Two desired to get married but could not under Utah's laws.  *Id.*  The third married in Iowa but wanted Utah to recognize that marriage.  *Id.* 72. Plaintiffs filed suit against the Utah Governor and Attorney General and the Salt Lake County Clerk in their official capacities, challenging Article 1, § 29

17

and Utah statutes defining marriage consistently with the constitutional provision. *Id.* 68, 73-74. Plaintiffs argued that Utah's definition of marriage violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. They requested a declaratory judgment so stating, and a permanent injunction barring enforcement of the challenged laws. *Id.* 68 *et seq.*

Plaintiffs and State Defendants filed cross-motions for summary judgment on October 11, 2013. *Id.* 108, 1747, 1943, 2005. The district court heard oral argument on December 4. *Id.* 2915, and issued a 53-page memorandum decision and order on December 20, 2013.

### G.     The district court's decision

The district court held that Utah's definition of marriage violates the Fourteenth Amendment in two main respects. But before analyzing the merits, the district court first determined that neither *Windsor* nor *Baker v Nelson,* 409 U.S. 810 (1972), controlled its decision. As to *Windsor*, the district court reasoned that federalism concerns were insufficient to save Utah's definition of marriage. Decision at 13. The court then determined that *Baker*—which squarely rejected the same claims Plaintiffs asserted—"is no longer controlling precedent."

18

Decision at 16.  Although the Supreme Court has never expressed any doubts about *Baker,* the district court reasoned that it had been superseded by Supreme Court decisions holding that sex is a quasi-suspect class (*Craig v. Boren,* 429 U.S. 190 (1976)), that States cannot irrationally target and impose legal disabilities on citizens based on their sexual orientation (*Romer v. Evans,* 517 U.S. 620 (1996)), and that States cannot criminalize private sexual conduct (*Lawrence v. Texas,* 539 U.S. 558 (2003)).  *Id.* at 14. Even more important to the district court was the fact that two dissenting Justices (Roberts, C.J. and Scalia, J.) both "foresaw" that the *Windsor* decision "would precede" state and federal lawsuits addressing the constitutionality of state laws defining marriage.  *Id.* at 15

On the merits, the district court announced, first, that the Due Process Clause gives Plaintiffs "a fundamental right to marry that protects their choice of a same-sex partner."  *Id.* at 31.  The court said that "the ability to procreate" was not a relevant distinguishing factor between opposite-sex and same-sex couples for purposes of marriage, based on its view that procreation "is not a defining characteristic of conjugal relationships from a legal and constitutional point of view."  *Id.* at 26.  The court also decided it did not have to follow the controlling

19

fundamental-rights analysis in *Washington v. Glucksberg,* 521 U.S. 702 (1997), because the "Supreme Court did not adopt this line of reasoning in the analogous case of *Loving v. Virginia"*—a curious observation given that *Loving* was decided some 30 years *before Glucksberg. See Loving* at 1. Decision at 28. Ultimately, the court determined that its fundamental rights holding was "required" by *Lawrence v. Texas,* 539 U.S. 558 (2003) at least as interpreted by Justice Scalia's dissent, which the district court quoted. *Id.* at 30-31.

Second, the court concluded that Utah's marriage laws, which require both men *and* women to marry someone of the opposite sex, actually treat the genders unequally. *Id.* at 34-35. Purporting to "[a]pply[] the same logic" as *Loving,* the court determined that the equal application of traditional marriage laws to men and woman did not preclude a finding of gender discrimination because the "equal application" of anti-miscegenation laws did not save those laws from heightened constitutional scrutiny. *Id.* at 35.

Although the district court purported to "find" that the laws at issue discriminate on the basis of sex and are therefore subject to heightened scrutiny, the court ultimately declined to analyze whether those laws actually satisfy heightened scrutiny because, in the court's

view, they do not even satisfy rational-basis review. *Id.* at 35. To begin, the district court determined its rational-basis analysis would not consider "whether extending marriage benefits to heterosexual couples serves a legitimate governmental interest. . . . [Rather,] [t]he court must . . . analyze whether the State's interests in responsible procreation and optimal child-rearing are furthered by *prohibiting* same-sex couples from marrying." *Id.* at 42-43 (emphasis added). From that perspective, and without questioning the legitimacy of Utah's interests, the district court found "no rational connection between" traditional marriage and the State's "goal of fostering an ideal family environment for a child." *Id.* at 42-43, 46-47.

Based on these conclusions, the district court enjoined Utah from enforcing the challenged marriage laws. State Defendants immediately appealed.

## H.    Stay proceedings

The district court refused to stay its injunction pending appeal. App. 2772. State Defendants immediately and unsuccesfully requested a stay from this Court. App. 2779. The State then petitioned Justice Sotomayor, Circuit Justice for the Tenth Circuit, for a stay. App. 2781,

21

2875. Justice Sotomayor referred the request to the full Supreme Court, which granted a stay pending resolution of this appeal.  App. 2914.

## SUMMARY OF ARGUMENT

A few short months ago, the Supreme Court held in *United States v. Windsor* that states have the authority under the federal Constitution to abandon the traditional man-woman definition of marriage and to redefine it in genderless terms—a power the Court said falls within the States' "broad[ ] authority to regulate the subject of domestic relations . . . ."  133 S. Ct. 2675, 2690 (2013).  The question here is whether Utah can use that same authority to *retain* the man-woman definition that has prevailed not only since the origins of this Nation, but since the beginning of history.  For three independent reasons, the State retains that authority, and the district court was incorrect to conclude otherwise based on its novel reading of the Fourteenth Amendment's guarantees of due process and equal protection.

A.    One reason the State retains that authority is that the Supreme Court has already held as much in *Baker v. Nelson*, 409 U.S. 810 (1972).  That decision dismissed on the merits the same Fourteenth Amendment challenges to the man-woman definition that the district

court sustained in this case. *Baker* is therefore binding here. *See, e.g., Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). *Baker* is also fully consistent with *Windsor*; indeed, it reflects the same principles of federalism that *Windsor* would later reaffirm.

In any event, as this Court is well aware, lower federal courts do not have authority to depart from binding Supreme Court precedent merely because they believe it has been undercut by what the district court called subsequent "doctrinal developments." The Supreme Court has held in no uncertain terms that, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," lower courts "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriquez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

B.     Even if *Baker* were not controlling, the Fourteenth Amendment does not deprive Utah of its authority to retain the man-woman definition of marriage. Contrary to the district court's conclusion, there is no fundamental Fourteenth Amendment right to a State marriage certificate allowing two people of the same sex to marry. As courts around the country have uniformly held, such a "right" does

23

not come close to satisfying the standard for fundamental *constitutional* rights set by the Supreme Court in *Washington v. Glucksberg*, 521 U.S. 702 (1997), namely, that the alleged right be "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." *Id.* at 720-21 (quotations and citations omitted).  Not surprisingly, the district court did not even attempt to meet this standard—again, incorrectly treating *Glucksberg* as having been *silently* overruled by *Windsor*.

 To be sure, the district court was right in refusing to find that the State acted with "animus" in retaining its traditional marriage definition.  And it was right in finding that under controlling Circuit law the Plaintiffs' equal-protection claims are governed by rational-basis review.

However, the district court erred in concluding that the State lacks an adequate justification for retaining the man-woman definition. As much as the State values and supports its gay and lesbian citizens, it is not the State's burden, on rational-basis review, to justify the implicit exclusion of same-sex couples from the State's definition of marriage.  Whether or not the definition is under- or over-inclusive, all

24

the State need show is that the definition as it stands rationally advances legitimate State interests. *See, e.g., Johnson v. Robison,* 415 U.S. 361, 385 (1947). Because the district court did not and could not deny that the current definition of marriage rationally advances the State's interests in (at a minimum) effective parenting and adequate procreation, the court should have rejected the Plaintiffs' equal-protection claim as a matter of law.

C.    Even if the Court were to apply heightened scrutiny—as the district court suggested in *dicta,* Utah's chosen definition is still well within its constitutional authority. Besides avoiding risks to religious freedom and civic peace, Utah's decision to retain that definition substantially advances at least three distinct State interests that are not only legitimate, but important and compelling.

*First,* maintaining the man-woman definition helps prevent further erosion of the traditional *concept* of marriage as being principally a child-centered institution, one focused first and foremost on the welfare of children rather than the emotional interests of adults. *See Windsor,* 133 S. Ct. at 2718 (Alito, J., dissenting) (discussing distinction between "conjugal" and "consent-based" views of marriage). A society can have but one understanding of marriage: It is either a

uniquely man-woman institution, or it is not.  Because man-woman unions are unique in their ability to produce children, maintaining the man-woman definition reinforces the child-centric view of marriage. And by reinforcing that understanding, the State gently encourages parents to routinely sacrifice their own interests to the legitimate needs and interests of their children.  Given its enormous benefits to children generally, the State has an important and compelling interest in encouraging selfless parenting.

*Second*, and more specifically, maintaining the man-woman definition increases the likelihood that children will be raised by their biological mothers and fathers—or at least *a* mother and father—in intact families.  Common sense and a wealth of social-science data teach that children do best emotionally, socially, intellectually and even economically when reared in an intact home by both biological parents. Such arrangements benefit children by (a) harnessing the strong biological connections that parents and children naturally feel for each other, and (b) providing what experts have called "gender complementarity"—i.e., diversity—in parenting.  Common sense and social science also teach that the second-best arrangement for children

is to be raised by a biological parent and an adoptive parent of the opposite sex.

In a variety of ways explained in detail below, the traditional definition of marriage encourages parents and would-be parents to raise their children in one of these preferred arrangements. And in a variety of ways, redefining marriage in genderless terms would likely reduce, over time, the proportion of children being raised in one of those arrangements—thus placing at serious risk the welfare of children who will be raised in other arrangements as a result.

*Third,* maintaining the man-woman definition helps to ensure adequate reproduction by parents willing and able to raise their children in stable homes. By providing special privileges and recognition to sexual unions that, as a class, are uniquely capable of procreation, the State gently encourages that vital activity. Indeed, that is why the Supreme Court has often called man-woman marriage "fundamental to our very existence and survival." *Loving,* at 12. The State has a compelling interest in ensuring adequate reproduction and, conversely, in avoiding a definitional change that (over time) could help send its birthrate below replacement levels—as has already happened

27

in a number of nations and U.S. States that have adopted a genderless definition.

For all these reasons, Utah has ample authority under the Constitution to retain its man-woman definition of marriage.

## STANDARD OF REVIEW

The Court reviews *de novo* a grant of summary judgment, *Christian Heritage Acad. v. Okla. Secondary Sch. Ass'n,* 483 F.3d 1025, 1030 (10th Cir. 2007), which must be granted only when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

## ARGUMENT

**THE DISTRICT COURT ERRED IN HOLDING THAT UTAH LACKS CONSTITUTIONAL AUTHORITY TO RETAIN ITS GENDERED DEFINITION OF MARRIAGE.**

**A.**  **The district dourt's decision contravenes *Baker v. Nelson*, which is both controlling and consistent with *Windsor* and the federalism principles it reaffirms.**

The first dispositive error in the district court's analysis is that it directly contravenes *Baker v. Nelson*, 409 U.S. 810 (1972), which itself anticipates and mirrors the principles of federalism and popular sovereignty later reiterated in *Windsor*.

28

### 1. *Baker* is controlling.

In *Baker,* the U.S. Supreme Court summarily dismissed, "for want of a substantial federal question, "an appeal by two men whom the State of Minnesota denied a marriage license "on the sole ground that petitioners were of the same sex." *Baker v. Nelson*, 191 N.W.2d 185, 185 (Minn. 1971). Such a summary dismissal is a decision on the merits by which "lower courts are bound … until such time as the Court informs (them) that (they) are not." *Hicks v. Miranda*, 422 U.S. 332, 344-45 (1975) (internal quotation marks omitted). A summary dismissal like the one in *Baker* "without doubt reject[s] the specific challenges presented in the statement of jurisdiction," and "prevent[s] lower courts from coming to opposite conclusions [1] on the precise issues presented and [2] necessarily decided by those actions." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). This case meets both *Mandel* prerequisites.

First, *Baker* unmistakably presented the "precise issues" ruled on by the district court here. *Baker,* 191 N.W. 2d. at 185. *Baker* plaintiffs specifically  claimed that the State's denial of a marriage license "deprive[d] [them] of their liberty to marry and of their property without due process of law under the Fourteenth Amendment" and

29

"violate[d] their rights under the equal protection clause of the Fourteenth Amendment." App. 221.

Second, the Minnesota Supreme Court "necessarily decided" these when it rejected claims that, by the denial of their application for a marriage license, "petitioners are deprived of liberty without due process and are denied the equal protection of the laws, both guaranteed by the Fourteenth Amendment." *Baker,* 191 N.W. 2d. at 186. The court sharply rebuffed the claim that same-sex marriage was a fundamental right, holding that "[t]he due process clause of the Fourteenth Amendment is not a charter for restructuring [marriage] by judicial legislation." *Id.* And the court held that equal protection was not offended by limiting marriage to a man and a woman without requiring proof of ability or willingness to procreate. According to the court, "the classification is no more than theoretically imperfect," and "'[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.'" *Id.* at 187 and n.4 (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940) (alteration in original)). The court also repudiated any analogy between the traditional definition of marriage and the anti-miscegenation laws invalidated in *Loving:* "[I]n commonsense and in a constitutional sense,

there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex." *Id.* at 187.

Given the analysis in the Minnesota Supreme Court's opinion and in the jurisdictional statement challenging that decision, numerous courts have recognized the Supreme Court's *Baker* decision as controlling on the constitutionality of State laws withholding marriage from same-sex couples. *See e.g., Massachusetts v. U. S. Dep't Health & Human Servs.*, 682 F.3d 1, 8 (1st Cir. 2012) ("*Baker* does not resolve our own case [under DOMA] but it does limit the arguments to ones that do not presume or rest on a constitutional right to same-sex marriage."); *Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 870-871 (8th Cir. 2006) (*Baker* mandates "restraint" before concluding "a state statute or constitutional provision codifying the traditional definition of marriage violates the Equal Protection Clause or any other provision of the United States Constitution"); *Adams v. Howerton*, 673 F.2d 1036, 1039 n.2 (9th Cir. 1982) (*Baker* is "a decision on the merits") (quotation omitted); *Donaldson v. State*, 292 P.3d 364, 371 n.5 (Mont. 2012); ("The U.S. Supreme Court's action in *Baker* has been described as binding precedent.") (citations omitted).  To our knowledge, no other federal

circuit or State supreme court has gone the other way.  The district

court likewise should have accepted *Baker* as controlling, and its failure

to do so requires reversal.

### 2. The district court's reasons for refusing to follow *Baker* are misguided.

For the district court, however, *Baker* was no more than a speed

bump.  It held that subsequent "doctrinal developments"—especially

the majority opinion in *Windsor*—left *Baker* with "little if any

precedential effect today."  Decision at 14.  For two reasons, that is

incorrect.

*First,* lower federal courts do not have the option of departing from

binding precedent simply because they believe it has been undercut by

later "doctrinal developments."  Although that possibilility had been

suggested in later decisions, the Supreme Court eliminated that option

in *Rodriquez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477

(1989).  That decision held in no uncertain terms:  "If a precedent of this

Court has direct application in a case, yet appears to rest on reasons

rejected in some other line of decisions," lower courts "should follow the

case which directly controls, leaving to this Court the prerogative of

overruling its own decisions." *Id.* at 484.  There is no doubt that *Baker* "directly controls" here.

*Second,* and more fundamentally, *Windsor* did not undercut *Baker.*  Indeed, the *Windsor* majority expressly disclaimed any intention to reach the issue decided in *Baker,* stating that its "opinion and its holding are confined to those lawful marriages" *already* authorized by state law.  133 S. Ct. at 2696.  That is why the majority did not even address *Baker*—much less criticize it—, which the Court surely would have done had it intended to overrule it.  Similalry, neither *Romer v. Evans*, 517 U.S. 620 (1996), nor *Lawrence v. Texas*, 539 U.S. 558 (2003), addressed the constitutionality of state marriage laws, and neither mentions *Baker*.

Nor is there any inconsistency between the *Baker* and *Windsor's* legal analysis.  *Windsor* invalidated DOMA § 3 because New York conferred an "equal dignity" on same-sex couples that the federal statute "displace[d]" by "treating those persons as living in marriages less respected than others."  133 S. Ct. at 2696.  In concluding that DOMA "injure[d] those whom the State, by *its* marriage laws, sought to protect in personhood and dignity," *id.* (emphasis added), the Court did

not create a free-standing substantive due process right for same-sex couples to marry.

Indeed, *Windsor* reinforced and complemented *Baker* by emphasizing the need to safeguard the States' "historic and essential authority to define the marital relation" free from "federal intrusion." 133 S. Ct. at 2692. The majority stressed that, "[b]y history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States." *Id.* at 2689-90. Most significantly, the Court reaffirmed that "[t]he definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of offspring, property interests, and the enforcement of marital responsibilities.'" *Id.* at 2691 (quoting *Williams v. North Carolina*, 317 U.S. 287, 298 (1942)) (alteration in original). And it was precisely *because* of its understanding of the marital relation as "'a virtually exclusive province of the States,'" *id.* at 2680 (quoting *Sosna*, 419 U.S. at 404), that the Court concluded that DOMA's refusal to respect New York's decision to permit same-sex marriage represented an impermissible "federal intrusion on state power." *Id.* at 2692.

34

When read together, *Baker* and *Windsor* establish a principled, federalism-based resolution to the difficult question of same-sex marriage: *Baker* leaves the definition of marriage for every State to decide for itself, while *Windsor* prohibits the federal government from interfering in the decision to allow same-sex marriage. As stated by a group of federalism scholars cited by the *Windsor* majority, such "diversity of outcomes enables the democratic process to accommodate a higher proportion of our citizens' views on [same-sex marriage] than would a uniform national answer. And it prevents the majority of States from impressing their policy preferences on the minority who want to recognize gay marriage." Brief of *Amici Curiae* Federalism Scholars, *United States v. Windsor*, No. 12-307, at 9 (2012). Respecting that federalism-mandated diversity is also essential to individual freedom—or what Justice Kennedy has called "liberty in the fundamental political sense of the term." *See Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) (the Framers "used the principles of separation of powers and federalism to secure liberty in the fundamental political sense of the term").[4]

---

[4] As Justice Kennedy has also noted, federalism "allows the States great latitude under their police power to legislate as to the lives, limbs, health,

The district court should have respected the principled compromise that the Supreme Court reached in *Baker* and *Windsor*, one that permits a "diversity of outcomes" on the question of marriage rather than mandating a "uniform national answer."[5]  The district court's failure to respect that compromise—and its consequent refusal to follow *Baker*—requires reversal.

### B.   Viewed in light of the proper legal standards, the district court's due process and equal protection holdings are legally erroneous.

*Baker* and *Windsor* were not the only casualties of the district court's due process and equal protection analyses.  Those analyses ignore or misapply controlling legal standards articulated by the Supreme Court and, as a result, conflict directly with decisions by other federal circuits as well as the highest courts of numerous states.

---

comfort and quiet of all persons."  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006)) (quotations and citations omitted).  That principle applies with special force to State decisions about marriage, which have enormous implications for the emotional and physical "health" and "comfort" of the State's children.

[5] As for the district court's mischaracterization of Justice Scalia's dissent, *see* Decision at 13, his concerns about where the majority's reasoning *might* lead cannot be taken as an endorsement of the notion that *Windsor* itself dictates same-sex marriage.  133 S. Ct. at 2709 (Scalia, J., dissenting) (agreeing that with regard to the state denial of marital status to same-sex couples "State and lower federal courts should take the Court at its word and distinguish away").

### 1. There is no fundamental due-process right to marry someone of the same sex.

As to the Plaintiffs' due process claim, the Supreme Court has expressed "reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). As a result, courts must "exercise the utmost care whenever . . . asked to break new ground in this field." *Id.*

Disregarding that guidance, the district court announced a new fundamental right to same-sex marriage without even mentioning the great weight of authority that has gone the other way. *See, e.g.*, *Andersen v. King Cnty.*, 138 P.3d 963, 979 (Wash. 2006) (en banc) ("Plaintiffs have not established that at this time the fundamental right to marry includes the right to marry a person of the same sex."); *Hernandez v. Robles*, 855 N.E.2d 1, 10 (N.Y. 2006) ("by defining marriage as it has, the New York Legislature has not restricted the exercise of a fundamental right"); *Lewis v. Harris*, 908 A.2d 196, 211 (N.J. 2006) ("we cannot find that a right to same-sex marriage is so deeply rooted in the traditions, history, and conscience of the people of this State that it ranks as a fundamental right."); *Dean v. District of*

*Columbia*, 653 A.2d 307, 333 (D.C. 1995) ("same-sex marriage cannot be called a fundamental right protected by the due process clause"); *Baker*, 191 N.W.2d at 186 ("The due process clause of the Fourteenth Amendment is not a charter for restructuring [marriage] by judicial legislation.").[6]  Indeed, "*no* appellate court applying a federal constitutional analysis has reached this result[.]" *Andersen*, 138 P.3d at 979 (emphasis added), including the Supreme Court.

Determining whether there is a fundamental right to same-sex marriage is controlled by *Washington v. Glucksberg*, 521 U.S. 702 (1997), and requires two steps.  The first is "a *careful* description of the asserted fundamental liberty interest," and the second is adding to the canon only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Id.* at 720-21 (quotations and citations omitted; emphasis added).  Carefully described, the interest asserted here is the fundamental right to marry someone of the same sex.  As the decisions cited above have recognized, such an

---

[6] *Accord Jackson v. Abercrombie*, 884 F. Supp. 2d 1065,1098 (D. Haw. 2012)2012) (no fundamental right to same sex marriage); *Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1017 n.9 (D. Nev. 2012).

interest is not "deeply rooted" but recently recognized, and even then by only a minority of states. Thirty-three states—66% of the country—are governed by laws like Utah's, defining marriage as between one man and one woman.

The district court's contrary conclusion erred in four critical ways. First, the district court mistakenly characterized Plaintiffs as "seeking access to an *existing* right, not the declaration of a new right." Decision at 29 (emphasis added). Tellingly, however, every Supreme Court decision cited by the district court for the fundamental right to marry was premised on a male-female relationship. *See Zablocki,* 434 U.S. at 379 ("appellee and the woman he desired to marry were expecting a child in March 1975 and wished to be lawfully married before that time."); *Loving,* 388 U.S. at 2 (describing the complainants as "Mildred Jeter, a Negro woman, and Richard Loving, a white man"). Indeed, the Supreme Court's most recent pronouncement on the subject, *Windsor,* indicated that same-sex marriage is a "new" right, and rejected the district court's assumption here that same-sex marriage is subsumed by the Court's "right to marry" precedents:

> It seems fair to conclude that, *until recent years*, many
> citizens had not even considered the possibility that two
> persons of the same sex might aspire to occupy the same

39

> status and dignity as that of a man and woman in lawful
> marriage.  For marriage between a man and a woman no
> doubt had been thought of by most people as essential to the
> very definition of that term and to its role and function
> throughout the history of civilization.

133 S. Ct. at 2689 (emphasis added).  *Windsor* then went on to note that

"the limitation of lawful marriage to heterosexual couples . . . for

centuries ha[s] been deemed both necessary and *fundamental*."  *Id.* at

2689 (emphasis added); *see also Lawrence*, 539 U.S. at 567, 578 (right to

intimate same-sex relationship free of criminal penalty does not imply a

right to "formal recognition" of that relationship).  Under *Windsor*'s

characterization, then, same-sex-marriage is the antithesis of a

fundamental right.

Second, the district court maintained that history and tradition

were "insufficient reasons" to withhold recognition from the asserted

right to same-sex marriage.  Decision at 29.  But that statement directly

conflicts with *Glucksberg*, which involved an asserted right to assisted

suicide.  There the Supreme Court concluded there was no fundamental

right at stake because of a "consistent and almost universal tradition

that has long *rejected* the asserted right, and *continues explicitly to*

*reject it today*."  521 U.S. at 723 (emphasis added).  The same is true

here.

Third, the district court reasoned that a fundamental right to same-sex marriage is implicit in notions of liberty and autonomy. Decision at 23-24. Again, this reasoning conflicts with *Glucksberg*, where the Court emphasized that simply because "many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected." *Glucksberg*, 521 U.S. at 727-28.[7]

Finally, the district court wrongly compared Utah's marriage laws with anti-miscegenation laws. Decision at 51-52. Anti-miscegenation laws were odious measures that rested on invidious racial discrimination. In contrast to these relics of the slave-holding South, as the *Windsor* majority put it, "marriage between a man and a woman no doubt ha[s] been thought of by most people as essential to the very definition of that term and to its role and function throughout the

---

[7] *Accord Stenberg v. Carhart*, 530 U.S. 914, 956-57, 961 (1999) (Kennedy, J., dissenting) (criticizing the majority for neglecting the States' "critical and legitimate role in legislating on the subject of abortion" and pointing out that the Constitution permits States to "take sides in the abortion debate and come down on the side of life, even life in the unborn"); *Gonzales v. Carhart*, 550 U.S. 124, 133 (2007) (sustaining a federal statute premised on governmental interests the majority had rejected in *Stenberg*).

history of civilization." *Windsor*, 133 S. Ct. at 2689. In other words, defining marriage as the union of one man and one woman may be controversial in today's political climate, but it is hardly invidious.

For all these reasons, this Court should reverse and follow the many federal circuit and State supreme court decisions that have uniformly declined to recognize a fundamental right to same-sex marriage.

**2. Under the district court's own conclusions about the legitimate purposes of Utah's definition, Utah does not deny same-sex couples the equal protection of the laws.**

Although the district court was correct in declining to hold that Utah's marriage laws are motivated by animus against gays and lesbians,[8] the court erred in holding that Utah's marriage laws nevertheless violate the plaintiffs' right to equal protection under the Fourteenth Amendment. That holding directly conflicts with numerous

---

[8] Plaintiffs cited *Romer v. Evans*, 517 U.S. 620 (1996), and *United States v. Windsor*, 133 S. Ct. 2675 (2013),), in support of their animus argument. But the district court was appropriately "wary of adopting such an approach here in the absence of more explicit guidance" from the Supreme Court. Decision at 39. Even more fundamentally, the district court properly concluded that "it is impossible to determine what was in the mind of each individual voter." *Id.* at 40. There is no need for this Court to revisit this aspect of the district court's ruling.

other decisions holding that state laws defining marriage as only

between a man and a woman pass equal-protection scrutiny.  *E.g.*

*Bruning,* 455 F.3d at 867-68; *Sevcik,* 911 F. Supp. 2d at 1015-16.[9]

Under the district court's *own* conclusions about the purposes

underlying those laws, and applying the proper rational-basis standard,

those laws plainly pass equal-protection muster.

    **Rational basis applies.**  Acknowledging this Court's holding in

*Price-Cornelison* v. *Brooks*, 524 F.3d 1103, 1113 (10th Cir. 2008), the

district court correctly concluded that this Court "currently applies only

rational basis review to classifications based on sexual orientation."

Decision at 36.  At least nine other circuits have reached the same

conclusion.[10]  Most importantly, the Supreme Court has never applied

---

[9] *Accord Jackson,* 884 F. Supp. 2d at 1111-1115; *In re Kandu,* 315 B.R. 123, 145-146 (Bankr. W.D. Wash. 2004)*; Adams v. Howerton,* 486 F. Supp. 1119, 1124-25 (C.D. Cal. 1980),), *aff'd on other grounds*, 673 F.2d 1036 (9th Cir. 1982); *Dean v. District of Columbia,* 653 A.2d 307, 363 (D.C. 1995) (Steadman, A.J., concurring); *Morrison v. Sadler*, 821 N.E.2d 15, 23- 31 (Ind. Ct. App. 2005); *Hernandez v. Robles,* 855 N.E.2d 1, 7-9 (N.Y. 2006) (plurality op.); *Baker*, 191 N.W.2d at 186-87; *In re Marriage of J.B. & H.B.,* 326 S.W.3d 654, 676-78 (Tex. App. 2010);).

[10] *See*, *e.g.*, *Davis* v. *Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012);2012); *Cook* v. *Gates*, 528 F.3d 42, 61-62 (1st Cir. 2008); *Bruning*, 455 F.3d at 866-67; *Johnson* v. *Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Lofton* v. *Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004); *Thomasson* v. *Perry*, 80 F.3d 915, 927-28 (4th Cir. 1996); *High Tech Gays* v. *Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 573-74 (9th Cir.

heightened scrutiny based on sexual orientation despite repeated invitations to do so, including most recently in *Windsor*. *See, e.g.*, U.S. Br. at 18-36, App. 2441-59 (arguing that "classifications based on sexual orientation should be subject to heightened scrutiny"). On the contrary, *Windsor* held that DOMA § 3 was invalid for lacking a "*legitimate* purpose," 133 S. Ct. at 2696 (emphasis added). This is standard rational-basis language, and it contrasts sharply with the requirements of strict scrutiny, *see, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (strict scrutiny requires showing that law is "narrowly tailored" to "further *compelling* governmental interests") (emphasis added), and intermediate scrutiny, *see, e.g., Craig v. Boren*, 429 U.S. 190, 197 (1976) (intermediate scrutiny requires that gender classifications "serve *important* governmental objectives" and be "substantially related to achievement of those objectives.") (emphasis

---

1990); *Ben-Shalom* v. *Marsh*, 881 F.2d 454, 464 (7th Cir. 1989); *Woodward* v. *United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989); *Padula* v. *Webster*, 822 F.2d 97, 103 (D.C. Cir. 1987).

Just last month, a Ninth Circuit panel repudiated its prior precedent and applied heightened scrutiny to a *Batson* challenge alleging that a juror was improperly struck based on sexual orientation. *Smithkline Beecham Corp. v. Abbott Labs*, __ F.3d __, 2014 WL 211807 (9th Cir., January 21, 2014) (Reinhart, J.). That panel's conclusion that *Windsor* adopted heightened scrutiny without saying so is incorrect for reasons explained in the text.

added).  In sum, there is no basis for this Court to revisit its own well-settled precedent on this point.

The district court was also wrong to "find"—albeit in *dicta*—that heightened scrutiny applies because it said Utah's marriage definition discriminates on the basis of sex.  In allowing only marriages between men and women, Utah law affects men as a class and women as a class identically, to the disadvantage of neither.

Contrary to the district court's analogy, moreover, *Loving* involved strict scrutiny of a wholly invidious marriage regime bent on racial oppression, which justified the Court's summary rejection of arguments based on a formal equality between the races.  But in the sex-discrimination context, "[a]ll of the [Supreme Court's] seminal. . . decisions. . .have invalidated statutes that single out men or women *as a discrete class* for unequal treatment."  *Baker v. State,* 744 A.2d 864, 880 n.13 (Vt. 1999) (collecting cases, emphasis added).  In contrast, Utah's marriage definition is not "directed toward persons of any particular gender" and does not "affect people of any particular gender disproportionately such that a gender-based animus [could] reasonably

be perceived." *Sevcik*, 911 F. Supp. 2d at 1005.[11]  The district court's

contrary conclusion was erroneous.

**Rational basis is satisfied.**  The district court held instead that

Utah's marriage laws could not survive even under rational basis

review.  That holding, however, fundamentally "misapprehend[s] the

nature of rational-basis scrutiny, which is the most relaxed and tolerant

form of judicial scrutiny under the Equal Protection Clause." *City of*

*Dallas v. Stanglin*, 490 U.S. 19, 26 (1989).  Especially when applied to

state laws, such review is a "paradigm of judicial restraint" that denies

courts any "license . . . to judge the wisdom, fairness, or logic of

legislative choices." *F.C.C v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313,

314 (1993).

Accordingly, Utah's marriage laws must be "accorded a strong

presumption of validity." *Heller v. Doe*, 509 U.S. 312, 320 (1993).  They

must be upheld "so long as there is a *plausible* policy reason for the

classification." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (emphasis

added).  Those reasons, moreover, "may be based on rational

---

[11] *Accord, e.g., Jackson*, 884 F. Supp. 2d at 1098-99; *Smelt* v. *County*, 374 F. Supp. 2d 861, 876-77 (C.D. Cal. 2005) *aff'd in part, vacated in part*, 447 F. 3d 673 (9th Cir. 2006); *Wilson* v. *Ake*, 354 F. Supp. 2d 1298, 1307-08 (M.D. Fla. 2005).

speculation unsupported by evidence or empirical data." *Beach Commc'ns, Inc.*, 508 U.S. at 315. Indeed, "rational-basis review must be particularly deferential" when reviewing challenges to marriage laws. *Bruning*, 455 F.3d at 867.

Most important, under rational-basis review, a classification must be sustained if the inclusion of one group provides a legitimate governmental purpose, and the addition of other groups would not. *Johnson v. Robison*. Thus, under *Johnson's* inclusion analysis, it is not Utah's burden to show that "denying marriage to same-sex couples is necessary to promote the state's interest or that same-sex couples will suffer no harm by an opposite-sex definition of marriage." *Abercrombie*, 884 F. Supp. 2d at 1108 (citation omitted). Instead, "the relevant question is whether an opposite-sex definition of marriage furthers legitimate interests that would not be furthered, or furthered to the same degree, by allowing same-sex couples to marry." *Id.* Because the district court did not dispute that the laws at issue here further legitimate interests that would not be furthered to the same degree by allowing same-sex marriages, it should have rejected the Plaintiffs' equal protection claims as a matter of law.

Indeed, as the court acknowledged, "No one disputes" "that marriage benefits serve not just legitimate, but compelling governmental interests . . . ." Decision at 42. Under proper rational basis review, that should have ended the district court's inquiry.

Yet the district court improperly reframed the test, asking whether the state's compelling interests were "furthered by *prohibiting* same-sex couples from marrying." *Id*. at 43 (emphasis added). As just discussed, that is not Utah's burden. Indeed, under *Johnson's* inclusion analysis, underinclusiveness challenges like the one the district court framed here virtually always fail rational-basis review. As the Supreme Court has held, "[e]ven if [a] classification . . . is to some extent both underinclusive and overinclusive, and hence the line drawn by [the legislature or people] imperfect, it is nevertheless the rule that in [rational basis review] 'perfection is by no means required.'" *Vance v. Bradley*, 440 U.S. 93, 108-09 (1979) (quoting *Phillips Chemical Co. v. Dumas Sch. Dist.*, 361 U.S. 376, 385 (1960)). As the Court has also instructed, federal courts "will not overturn such [classifications] unless the varying treatment of different groups or persons is so unrelated to the achievement of *any* combination of legitimate purposes that we can only conclude that the [classifications] were irrational." *Kimel v.*

48

*Florida Bd. of Regents*, 528 U.S. 62, 84 (2000) (citation and quotation marks omitted; emphasis added).  If rational basis review were otherwise, innumerable legislative classifications and regulations would fall.

Accordingly, based solely on the district court's misstatement and misapplication of the rational-basis standard, this Court can reverse the district court's equal-protection holding as well as its due-process holding.[12]

---

[12] Based on its holding that Utah's marriage laws are unconstitutional, the district court considered as moot the claim of Plaintiffs Karen Archer and Kate Call that Utah's laws are unconsitituional to the extent they prohibit recognition of their marriage that was validly performed in Iowa.  Decision at 51.  However, as explained above, Utah's marriage laws are constitutional and Utah has a constitutionally valid policy to not recognize same-sex marriages regardless of where they are performed.  Therefore, the constitution does not require Utah to recognize the Plaintiffs' Iowa marriage. *See e.g., Nevada v. Hall*, 440 U.S. 410, 422 (1979).  Forcing a state to recognize same-sex marriages performed elsewhere "would be the most astonishingly undemocratic, counter-majoritarian political development in American history."  Patrick J. Borchers, Baker v. General Motors: *Implications for Interjurisdictional Recognition of Non-Traditional Marriages*, 32 Creighton L. Rev. 147, 150 (1998).  And Section 2 of the federal Defense of Marriage Act – which was not addressed in *Windsor* or challenged below—squarely forecloses these Plaintiffs' claim to recognition in Utah. *Windsor,* 133 S. Ct. at 2682-83 (noting that section 2 of DOMA, 28 U.S.C. § 1738C, was not at issue and allows States to refuse to recognize same-sex marriages performed in other States).

**C.    The district court erred in failing to give adequate weight to Utah's reasons, supported by common sense and substantial social science, for retaining the man-woman definition of marriage.**

The district court's error is confirmed by a careful examination of Utah's reasons for upholding marriage as the union of husband and wife.  Those reasons are not just rational, they are compelling.  Indeed, they are so compelling that until only a few years ago there was nearly unanimous agreement among learned thinkers—from philosophers, anthropologists and sociologists to eminent jurists and policy makers—that stable marriages between men and women are indispensable to the welfare of both children and society.  Society has an existential need to secure a sufficient social and economic base to care for the elderly; to fund social welfare programs; and to foster the hope, self-sacrifice and civic virtue that come only from a culture that treasures children as its greatest asset.  That is why, as the Eleventh Circuit observed, "It is hard to conceive an interest more legitimate and more paramount for the state than promoting an optimal social structure for educating, socializing, and preparing its future citizens to become productive participants in civil society." *Lofton* v. *Secretary of the Dep't of Children & Family Servs.*, 358 F.3d 804, 819 (11th Cir. 2004).

50

We next examine just four of the compelling reasons that underlie Utah's decision to retain its gendered definition of marriage. Each represents a vital State interest. And each of them suffices to overturn the district court's ruling under the controlling rational basis standard, which requires merely "a *plausible* policy reason for the classification." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (emphasis added). Each is likewise sufficient to sustain Utah's decision under any form of heightened scrutiny. And although the State is not obligated to show harm, we nevertheless demonstrate some of the common-sense harms and risks that redefining marriage would likely pose to each of these State interests in the welfare of its children, present and future.

1. **Utah's marriage definition furthers the State's vital interest in fostering a child-centric marriage culture that encourages parents to subordinate their own interests to the needs of their children.**

At the most basic level, Utah has a critical interest in preserving the child-centric, husband-wife ("conjugal") marriage culture that it has carefully nurtured since its inception as a State. Redefining marriage in an adult-centric, "consent-based" manner undermines that culture to the detriment of all Utah's children.

**The historic rationale for man-woman marriage.**  That culture—and the man-woman definition on which it is based—arises from a biological and sociological reality:  Procreation is an inherently gendered enterprise; no child can be conceived without a man and a woman.  And although sex between men and women naturally—and often accidentally—produces children, it does not necessarily produce stable families dedicated to protecting and nurturing those children.

Thus the perennial challenge for societies throughout history has been to establish a means of formally linking mothers *and* fathers with their offspring so as to maximize the welfare of children, and hence of the community.[13]  Marriage between the man and woman who create a child provides that essential link.

Hence, as the New York Court of Appeals has noted, until recently "it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex."  *Hernandez*, 855 N.E.2d at 8.  Indeed, this gendered and child-centered understanding of marriage

---

[13] Robert George et al., *What is Marriage? Man and Woman: A Defense* 28-30, 33-36, 97 (2012) App. 1463-1471, cited in *Windsor,* 133 S.Ct. at 2715, 2718 (Alito, J., dissenting).

has long been so ubiquitous, and considered so compelling by eminent authorities, that to cite and quote even a small percentage of those authorities could easily consume an entire book.[14]

**Marriage as a social institution.** Because of its critical social functions, marriage is also one of our most important social institutions. Such institutions are maintained by shared public meanings—a web of expectations and understandings that profoundly influence behavior.[15]

---

[14] *See, e.g., supra* at Statement, Section B; *accord* 2 Charles de Montesquieu, *The Spirit of Laws* 101 (Thomas Nugent ed. 1873); Bronislaw Malinowski, *Sex, Culture, and Myth* 11 (1962) App. 1057; G. Robina Quale, *A History Of Marriage Systems* 2 (1988) App. 1033 ("Marriage, as the socially recognized linking of a specific man to a specific woman and her offspring, can be found in all societies."); James Q. Wilson, *The Marriage Problem* 24 (2002) ("a lasting, socially enforced obligation between man and woman that authorizes sexual congress and the supervision of children" exists and has existed "[i]n every community and for as far back in time as we can probe"); *see id.* at 41; App. 1051; ("Marriage is a socially arranged solution for the problem of getting people to stay together and care for children that the mere desire for children, and the sex that makes children possible, does not solve."); W. Bradford Wilcox et al., Institute for American Values, *Why Marriage Matters: Thirty Conclusions from the Social Sciences* 20 (3rd ed. 2011) App. 456 ("[M]arriage across societies is a publicly acknowledged and supported sexual union that creates kinship obligations and resource pooling between men, women, and the children that their sexual union may produce.").

[15] As noted by the father of modern social anthropology, A.R. Radcliffe-Brown, social institutions like marriage are "the ordering by society of the interactions of persons in social relationships." A.R. Radcliffe-Brown, *Structure and Function in Primitive Society* 10-11 (1952). Accordingly, "a person [in a social institution] knows that he [or she] is expected to behave according to these norms and that the other person should do the same." *Id.*

Because shared public meanings are the components of social
institutions, those institutions necessarily are changed when those
meanings are changed or are no longer sufficiently shared.[16]  And if
public meanings and norms change enough the institution can be
effectively "deinstitutionalized."  When that happens, another
institution, with different meanings and norms, can take the place of
the old one, and the social benefits generated by the original meanings
and norms either dissipate or disappear.[17]

Accordingly, if the man-woman definition at the core of society's
understanding of marriage were replaced by a different meaning (i.e.,

---

[16] *See, e.g.*, Eerik Lagerspetz, *The Opposite Mirrors:  An Essay on the Conventionalist Theory of Institutions* 28 (1995); Eerik Lagerspetz, *On the Existence of Institutions, in On the Nature of Social and Institutional Reality* 70, 82 (Eerik Lagerspetz et al. eds., 2001); Monte Neil Stewart, *Genderless Marriage, Institutional Realities, and Judicial Elision*, 1 Duke J. Const. L. & Pub. Pol'y 1, 10-11 (2006); John R. Searle, *Making the Social World:  The Structure of Human Civilization* 89-122 (2010) App. 1347-1357; John R. Searle, *The Construction of Social Reality* 32, 57, 117 (1995) App. 1282, 1290, 1322.  As Prof. Searle explains:  "The secret of understanding the continued existence of institutional facts is simply that the individuals directly involved and a sufficient number of members of the relevant community must continue to recognize and accept the existence of such facts. . . . The moment, for example, that all or most of the members of a society refuse to acknowledge [the social institution of] property rights, as in a revolution or other upheaval, property rights cease to exist in that society." *Id.* at 117 App. 1322.

[17]   *See, e.g.,* Monte Neil Stewart, *Marriage Facts*, 31 Harv. J.L. & Pub. Pol'y 313, 327-28 (2008),), and sources cited therein.

the union of any two or more consenting adults), the existing meaning would become deinstitutionalized. As a result, the benefits produced by that meaning would either wane or be lost.

A given society, moreover, can have only one social institution denominated "marriage."[18]  It cannot simultaneously have as shared, core meanings of the marriage institution *both* "the union of a man and a woman" *and* "the union of any two persons."  One meaning necessarily displaces the other, leading to different understandings, incentives and behaviors.  Moreover, as the new meaning is mandated in texts, in schools, and in other parts of the public square, the old institution no longer channels or shapes perceptions and conduct.[19]

The law plays a critical role in shaping and preserving social institutions like marriage.  As the eminent legal scholar Joseph Raz has explained, the law often supports social institutions "in order to give them formal recognition, bring legal and administrative arrangements

---

[18]  *See, e.g.,* Stewart, *Genderless Marriage, supra* note 16, at 24-26, and sources cited therein.

[19] *See* Carl E. Schneider, *The Channeling Function in Family Law*, 20 Hofstra L. Rev. 495, 498 (1992) ("[I]t is [social institutions'] very presence, the social currency they have, and the governmental support they receive which combine to make it seem reasonable and even natural for people to use them. Thus people can be said to be channeled into them.").

into line with them, facilitate their use by members of the community who wish to do so, and encourage the transmission of belief in their value to future generations.  In many countries this is the significance of the legal recognition of monogamous marriage . . . ."[20]  To be sure, marriage, like many other social institutions, has its own social conventions, norms, and shared understandings that extend beyond the law's reach.  Yet the law can also change the institution by suppressing, rather than reinforcing, existing conventions, norms, and shared understandings.

**The State's *public* interest in marriage.**  As presently understood in Utah, and as understood throughout most of history, marriage's most vital public purpose is to encourage the creation of stable, husband-wife unions for the benefit of their children.[21]  People may also place great weight on romance, companionship and mutual economic support—which the man-woman marriage institution also supports and nurtures.  But these *private* ends—though important—are

---

[20]   Joseph Raz, *The Morality Of Freedom* 161 (1986).

[21] *See*, *supra*, Statement, Section B. The philosopher Bertrand Russell bluntly noted that, "[b]ut for children, there would be no need of any institution concerned with sex." Bertrand Russell, *Marriage & Morals* 77 (Liveright 1970).

not the principal interests the State pursues by regulating marriage. The State's fundamental *public* interest in marriage lies in maximizing the welfare of children—present and future. After all, children are the most vulnerable members of society, and the least capable of protecting their own interests.

First and foremost, the man-woman definition of marriage promotes the interests of children by fostering a generally child-centric marriage culture that encourages parents routinely to subordinate their own private interests—emotional, sexual, career, recreational, etc.—to the needs of their children, present and future. That encouragement flows not just from the law—including restrictions on divorce and prohibitions on such things as child neglect[22]—but also from the cultural expectations, norms and ideals that make marriage a social institution.[23] In a host of ways, such rules, norms and expectations guide husband-wife couples to sacrifice their personal desires for the benefit of their children. They teach, as one New York court aptly put

---

[22] *See, e.g.,* Utah Code § 30-3-11.3 (Divorcing parents required to attend course to "sensitize [them] to their children's needs both during and after the divorce process."); Utah Code § 78A-6-302 *et seq.* (Abuse, Neglect and Dependency Proceedings); *see also supra* at Statement, Section D.

[23] A.R.Radcliffe-Brown, *Structure and Function in Primitive Society, supra,* at 10-11.

57

it, that marriage is "not primarily about adult needs for official

recognition and support, but about the well-being of children and

society . . . ." *Hernandez v. Robles*, 805 N.Y.S.2d 354, 360 App. Div.

2005, *aff'd* 855 N.E.2d 1 (N.Y. 2006).

**Child-centered vs. adult-centered marriage.**  The district

court's ruling rests on a very different understanding of the principal

public purpose and meaning of marriage—one centered on

accommodating adult relationship choices.  In the district court's view,

the most important purpose of marriage is to provide "'state recognition

and approval of a *couple's* choice to live with each other, to remain

committed to one another and to form a household based on their own

feelings about one another[,] and to join in an economic partnership and

support one another and any dependents.'"  Decision at 25 (quoting

*Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 961 (N.D. Cal. 2010)).

This formulation ignores Utah's stated rationale for its marriage

definition.  And tellingly, it does not mention children, except indirectly

through its generic reference to "dependents."  Even then, children are

mentioned only as an afterthought—to be supported, like any other

"dependent," if they happen to be part of the household—rather than as

a principal object of the marital relationship.

While this adult-centric conception of marriage may have gained ascendancy in other jurisdictions, it does not hold in Utah, where the People, through multiple democratic processes, have chosen a different and more child-centric model. They and, hence, the State have steadfastly sought to reserve unique social recognition for man-woman marriage so as to guide as many procreative couples as possible into the optimal, conjugal childrearing model. Accordingly, redefining marriage as a genderless, adult-centric institution would fundamentally change Utah's child-centered meaning and purpose of marriage. As the New Jersey Supreme Court put it in *Lewis v. Harris*, 908 A.2d 196, 222 (N.J. 2006): "To alter that meaning would render a profound change in the public consciousness of a social institution of ancient origin."

The district court brushed aside this reality, but it cannot be escaped. A statement on marriage and the law by 101 legal scholars and social scientists notes that "the basic understanding of marriage" underlying much of the advocacy for redefining marriage "is seriously flawed." Institute for American Values, *Marriage and the Law: A Statement of Principles* 18 (2006), App. 542. That is because "[i]t is adult-centric, turning on the rights of adults to make choices," and because it "fail[s] to treat with intellectual seriousness any potential

59

consequences that changing the basic legal definition of marriage may have for the children of society," such as "disconnect[ing] marriage from its historic connection to procreation." *Id.* Definitions matter— especially for so essential a social institution as marriage. And while other jurisdictions may choose to elevate adult-centric relationships, Utah has chosen a different course—using its constitutionally protected police power, including its authority over domestic-relations law, to further its considered judgment about how best to protect the interests of all its children.

**Effects of the district court's redefinition**. Utah's self-sacrificing, child-centric view of marriage and parenting is important to a range of parental decisions beyond ensuring that the child is raised by both her father and her mother. For example, it might encourage parents to forego abusing alcohol or drugs; avoid destabilizing extramarital affairs; avoid excessively demanding work schedules; or limit time-consuming hobbies or other interests that take them away from their children.

This is not to say that other parents cannot make the same selfless, child-centric choices as a biological mother and father; they clearly can. But, as Justice Alito noted in *Windsor,* redefining marriage

to include same-sex couples would be a powerful symbolic statement

that, at bottom, marriage is more about the interests of adults than the

needs of children, and it would thereby undermine the self-sacrificing,

child-centric model of marriage that Utah seeks to foster. *Windsor*, 133

S. Ct. at 2715-16, n.6 (Alito, J., dissenting). That redefinition might

result (at least in the short term) in a few more children living in

"married" households—but at the price of reorienting the whole concept

of marriage toward adult interests and away from the welfare of

children.

Utah cannot simply ignore this seismic shift. As the 101 legal and

social-science experts put it:

> One may see these kinds of social consequences of legal
> change as good, or as questionable, or as both. But to argue
> that these kinds of cultural effects of law do not exist, and
> need not be taken into account when contemplating major
> changes in family law, is to demonstrate a fundamental lack
> of intellectual seriousness about the power of law in
> American society.

*Marriage and the Law, supra,* at 26, App. 550.

In sum, the redefinition mandated by the district court would

change the public meaning of marriage so as to convey that marriage is

about the interests of adults, not the needs of children. In myriad ways,

that in turn would pose serious risks to the interests of children

generally.  Utah has an important—indeed, compelling—interest in preventing those risks.  *See e.g., United States v. Griffin*, 7 F.3d 1512, 1517 (10th Cir. 1993) ("Important government interests include . . . minimizing the risk of harm to . . . the public."); *Marcavage v. City of New York*, 689 F.3d 98, 105 (2d Cir. 2012) (managing potential risks "advances a substantial government interest.")

    **2.**    **Utah's marriage definition furthers the State's vital interest in children being raised by their biological mothers and fathers—or at least by a married mother and father—in a stable home.**

The most obvious and important impact of this shift—mandated by judicial redefinition of marriage in genderless terms—would be the loss of the State's ability to give special preference and recognition to families consisting of children being raised either by both biological parents or at least by two parents of opposite sex.  Common sense, long experience, and sociological evidence confirm that, in the aggregate, children do best when raised by their biological mothers and fathers in stable marriage unions.  These child-welfare benefits flow both from biology and gender complementarity (i.e. diversity) in parenting, and would be seriously disrupted or reduced if Utah were forced to redefine its marriage law to include same-sex couples.

**The importance of mother-father parenting.**  Intuitively, a family structure based on the biological connection between parents and their natural children helps maximize the commitment of *both* parents to their children's welfare, unifying the parents' emotional and social commitments with instinctive biological attachments.  That intuition finds confirmation in a wealth of social science research.  As one reviewer explains, "research clearly demonstrates that family structure matters for children, and the family structure that helps children the most is a family headed by *two biological parents* in a low-conflict marriage."[24]

This biological advantage is further enhanced by the unique, gender-based contributions that fathers and mothers make to their children's wellbeing.  While the value of gender diversity in parenting is common sense to many, the notion likewise finds confirmation in a growing body of social science research.  As a group of 70 scholars recently concluded, the "empirical literature on child well-being

---

[24] Kristin Anderson Moore et al., *Marriage From a Child's Perspective: How Does Family Structure Affect Children and What Can We Do About It*, Child Trends Research Brief 6 (June 2002) App. 1101 (emphasis added) (hereinafter "Moore"); *accord id.* at 1-2; App. 1096-97; ("[I]t is not simply the presence of two parents, . . . but the presence of *two biological parents* that seems to support children's development.").

suggests that the two sexes bring different talents to the parenting

enterprise, and that children benefit from growing up with both

biological parents."[25]  In other words, the benefits flow not just from

having *two* parents of any gender, but from what scholars call "gender-

differentiated" or mother-father parenting:  "The burden of social

science evidence supports the idea that gender-differentiated parenting

is important for human development and that the contribution of

fathers to childrearing is unique and irreplaceable."[26]  Indeed, research

shows that men and women parent children differently, and in so doing

contribute distinctly to healthy child development.[27]

---

[25] Witherspoon Institute, *Marriage and the Public Good: Ten Principles* 18 (2008) App. 507.

[26] David Popenoe, *Life Without Father: Compelling New Evidence That Fatherhood & Marriage are Indispensable for the Good of Children & Society* 146 (1996) App. 1069; *accord, e.g.,* Norval D. Glenn, *The Struggle for Same-Sex Marriage*, 41 Soc'y 25, 27 (2004) ("[T]here are strong theoretical reasons for believing that both fathers and mothers are important, and the huge amount of evidence of relatively poor average outcomes among fatherless children makes it seem unlikely that these outcomes are solely the result of the correlates of fatherlessness and not of fatherlessness itself."); Wilson, *The Marriage Problem*, *supra*, at 169 App. 1052; ("The weight of scientific evidence seems clearly to support the view that fathers matter.").

[27] Although he later embraced the movement to redefine marriage to include same-sex couples, child-development expert Michael Lamb pointed out nearly 40 years ago that "[b]oth mothers and fathers play crucial and qualitatively different roles in the socialization of the child." Michael E. Lamb, Fathers: *Forgotten Contributors to Child Development*, 18 Human Development 245,

Moreover, the law itself "historically . . . has recognized that natural bonds of affection"—*i.e.*, biological connections—"lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). [28] *Accord, e.g., Gonzales v. Carhart*, 550 U.S. 124, 159 (2007) ("Respect for human life finds an ultimate expression in the bond of love the mother has for her child."). Moreover, as New York's high court put it, "[i]ntuition and experience suggest that a child benefits from having before his or her eyes, every day, living models of what *both* a man and a woman are like." *Hernandez*, 855 N.E.2d at 7 (emphasis added). And Justice Brennan summarized it well: "the optimal situation for the child is to have both an involved mother and

---

246 (1975); *accord* Dean Byrd, *Gender Complementarity and Child-reading: Where Tradition and Science Agree*, 6 J. L. & Fam. Studs. 213 (2004); *see also* A. Dean Byrd & Kristen M. Byrd, *Dual-Gender Parenting: A Social Science Perspective for Optimal Child Rearing, in Family Law: Balancing Interests and Pursing Priorities* 382-387 (2007).

[28] As Blackstone put it centuries ago, there is "implant[ed] in the breast of every parent that natural . . . insuperable degree of affection, which not even the deformity of person or mind, not even the wickedness, ingratitude, and rebellion of children, can totally suppress or extinguish." 1 William Blackstone, *Commentaries*, *447.

an involved father." *Bowen v. Gilliard*, 483 U.S. 587, 614 (1987)

(Brennan, J., dissenting).[29]

Conversely, experience and research alike confirm that children

suffer when procreation and childrearing occur outside stable man-

woman marriages. As a leading research survey explains:

> Children in single-parent families, children born to
> unmarried mothers, and children in stepfamilies or
> cohabiting relationships face higher risks of poor outcomes
> than do children in intact families headed by two biological
> parents. Parental divorce is also linked to a range of poorer
> academic and behavioral outcomes among children. There is
> thus value for children in promoting strong, stable
> marriages between biological parents.[30]

---

[29] The importance of mother-father parenting is so universally recognized
that the United Nations Convention on the Rights of the Child declares that
a child "as far as possible, [has the right] to know and be cared for by his or
her parents." Convention on the Rights of the Child 1577 U.N.T.S. 3, 47.

[30] Moore, *Marriage from a Child's Perspective, supra,* at 6; App. 1101; *accord
Marriage and the Public Good: Ten Principles, , supra,* at 17; App. 506;
("[C]hildren raised in single-parent families without the benefit of a married
mother and father are two to three times more likely to experience serious
negative life outcomes such as imprisonment, depression, teenage pregnancy,
and high school failure, compared to children from intact, married families—
even after controlling for socioeconomic factors that might distort the
relationship between family structure and child well-being."); Bruce J. Ellis
et. al, *Does Father Absence Place Daughters at Special Risk for Early Sexual
Activity and Teenage Pregnancy?,* 74 Child Dev. 801 (2003) (concluding that
father absence is associated with early sexual behavior of girls, even when
other factors, such as stress and poverty, were accounted for); Stephanie
Weiland Bowling & Ronald J. Werner-Wilson, *Father-Daughter Relationships
and Adolescent Female Sexuality: Paternal Qualities Associated with
Responsible Sexual Behavior,* 3 J. HIV/AIDS Prevention & Educ. Adolescents

These findings are reinforced by a study comparing three groups of young adults:  those who were conceived by sperm donors, those adopted as infants, and those raised by their biological parents. Researchers "learned that, on average, young adults conceived through sperm donation are hurting more, are more confused, and feel more isolated from their families.  They fare worse than their peers raised by biological parents on important outcomes such as depression, delinquency and substance abuse."[31]  Studies also show that, even when they have two caregivers of the same sex, children who grow up without a father or a mother are socialized in a way that undermines their ability to function effectively in a dual-gender society.[32]

---

& Child. 5, 13 (2003) ("Daughters whose fathers gave them little time and attention were more likely to seek out early sexual attention from male peers."); Douglas W. Allen, *High School Graduation Rates Among Children of Same-sex Households*, 11 Rev. Econ. Household, 635-58 (2013); ("Children living with gay and lesbian families [in Canada] in 2006 were about 65% as likely to graduate compared to children living in opposite sex families. Daughters of same sex parents do considerably worse than sons."), *available at* http://www.springer.com/economics/microeconomics/journal/11150?hideChart =1#realtime (last visited Jan. 31, 2014).

[31] Elizabeth Marquardt et al., Institute for American Values, *My Daddy's Name is Donor: A New Study of Young Adults Conceived Through Sperm Donation* 5 (2010); App. 746.

[32] *See* Lawrence L. Wu & Brian C. Martinson, *Family Structure and the Risk of a Premarital Birth*, 54 American Sociological Rev. 210 (1993) teens of

This body of research explains why delinquency rates among boys whose fathers are absent from their homes is significantly higher than the rates for boys with a father at home.[33]  It also explains why "daughters raised outside of intact marriages . . . are approximately three times more likely to end up young, unwed mothers than are children whose parents married and stayed married."[34]

---

married parents have fewer pregnancies out of wedlock); Mark D. Regnerus, *How Different Are the Adult Children of Parents Who Have Same-Sex Relationships? Findings from the New Family Structures Study*, 41 Soc. Sci. Res. 752, 752-770 (2012); App. 1218; (finding significant differences between children raised by married mothers and fathers and those raised in other family structures, including those raised by same-sex couples). Professor Regnerus' study has been criticized by advocates of the "moms-and-dads-are-interchangeable" theory.  But in his thorough response, he concludes that, even accounting for his critics' concerns, the data "still reveal numerous differences between adult children who report maternal same-sex behavior (and residence with her partner) and those with still-married (heterosexual) biological parents." Mark D. Regnerus, *Parental Same-Sex Relationships, Family Instability, and Subsequent Life Outcomes for Adult Children: Answering Critics of the New Family Structures Study with Additional Analysis*, 41 Soc. Sci. Res. 1367, 1367 (2012); App. 1238; *see also,* Allen, *High School Graduation Rates Among Children of Same-sex Households, supra* 30.

[33] Lynn D. Wardle, *The Fall of Marital Stability and the Rise of Juvenile Delinquency,* 10 J. L. & Fam. Studs. 83 (2007) (comprehensive review of literature and social science).

[34] Richard G. Wilkins, *Adult Sexual Desire and the Best Interests of the Child,* 18 St. Thomas L. Rev. 543, 594 (2005) (internal quotation marks omitted). *Accord, e.g.*, Cynthia C. Harper and Sara S McLanahan, *Father Absence and Youth Incarceration,* 14 J. Res. Adolescence 369, 384-86 (2004)) (finding that compared with all other family forms, "[y]outh who never had a father in the household had the highest incarceration odds").

In addition, when parents, and particularly fathers, do not take responsibility for raising their children, the State is often forced to assist through costly social welfare programs and other means. A recent study estimates that divorce and unwed childbearing "costs U.S. taxpayers at least $112 billion each and every year, or more than $1 trillion each decade."[35] This cost is not related to whether single parents or same-sex couples can be wonderful and loving parents; they clearly can. These studies simply show that both the biological connection and the gender diversity inherent in the married, mother-father parenting model powerfully enhance child welfare, even as they protect the State's fisc. Such considerations likewise provide compelling support for Utah's marriage model.

**The success of Utah's marriage laws and policies.** To achieve this and other benefits to children, Utah has chosen to embrace and, where possible, fortify the social institution of marriage in its traditional child-centric form. Thus, recognizing the close relationship between the law and social institutions governing family life, Utah has sought in its marriage laws to promote the gendered parenting model

---

[35] Benjamin Scafidi, Institute for American Values, *The Taxpayer Costs of Divorce and Unwed Childbearing: First-Ever Estimates for the Nation and All Fifty States* 5 (2008); App. 1378.

that has long been part of the social institution of marriage.  That

model privileges marriage over all other relationships thereby signaling

to *all* would-be parents that the State wants them to do their best to

ensure that any children they conceive are raised by their biological

mother and father within a stable marital union.  Official State

encouragement, and the social understandings that flow from it,

increase the overall likelihood that children will be raised in the

parenting environment that Utah and her citizens have found optimal.

   In Utah, this is not mere theory or conjecture.  Whatever the

effectiveness of traditional marriage laws in other states, Utah's

marriage laws and policies are achieving remarkable results.  As

Professor Price's affidavit demonstrates, Utah has the nation's lowest

percentage of unwed births—19.4%, less than half the national average

of 41%.  App. 426.  Utah also ranks first among states in the percentage

of children being raised by both parents from birth until age 17—78.6%

compared with a national average of 60.5%.  App. 427.  This no doubt

explains why the cost to Utah taxpayers associated with children who

live in other arrangements is among the lowest in the nation.[36]  But far more important is the benefit to children themselves:  As Professor Price concludes, "compared to children born in all the States, a child born in Utah has the *best* chance of knowing and being reared by his or her biological married mother and father."  App. 427.  That fact also likely explains why Utah has a very small percentage of its children growing up in poverty—15%, the fourth lowest in the Nation, compared to a national average of 23%.[37]  It also likely explains why Utah children, even in the lowest-income households, have one of the highest rates of upward mobility.[38]

---

[36]   That cost for Utah taxpayers is estimated at $276 million annually, or about $108 per capita, which is the 13th lowest per capita cost in the country. *See* Scafidi, *Taxpayer Costs*, *supra,* at 38, App. 1411.

[37] *See* Kids Count Data Center, Annie E Casey Foundation, *Children in Poverty* http://datacenter.kidscount.org/data/tables/43-children-in-poverty?loc=1&loct=2#ranking/2/any/true/868/any/322 (last visited January 30, 2014).

[38] *See* Raj Chetty et. al, *Where is the Land of Opportunity? The Geography of Intergenerational Mobility in the U.S., Table IV,* NBER Working Paper No. 19843 (January 2014),  http://obs.rc.fas.harvard.edu/chetty/mobility_geo.pdf (last visited Jan. 21, 2014) (concluding that children of low-income families in Salt Lake City have one of the highest rates of upward mobility among the Nation's 50 largest metropolitan areas).

Such real-world benefits to children are exactly what Utah's marriage policies are intended to produce, and what the district court's decision both ignores and imperils.

**How a redefinition would undermine Utah's Interests.**
Compelling Utah to redefine marriage to include same-sex couples—forcing it to replace its gendered marriage definition with a genderless one—would necessarily undermine the State's interest in promoting biological and gender-differentiated parenting in at least seven distinct ways. And most of these, by the way, have nothing to do with whether same-sex parenting is on average comparable in quality to man-woman parenting.

*First,* as many commentators have observed, because procreation is an inherently gendered affair, redefining marriage in genderless terms would break the critical conceptual link between marriage and procreation.[39] As a matter of biological fact, a same-sex couple cannot provide a child with the advantages either of two biological parents or of

---

[39] *See, e.g.*, George, *What Is Marriage?*, *supra,* at 7, App. 1452; (stating that if marriage is redefined the law will teach that marriage is "essentially an emotional union" that has no inherent connection "to procreation and family life"); Witherspoon Institute, *Marriage And The Public Good*, *supra,* at 18, App. 301; ("Same-sex marriage would further undercut the idea that procreation is intrinsically connected to marriage.").

gender complementarity in parenting:  By definition, either the child's biological father or mother (or both) will be absent.  In teaching that same-sex unions are on a par with traditional man-woman marriages, and thus that biological ties are of little or no importance to parenting, the redefinition ordered by the district court would tend to encourage more parents to raise their *existing* biological children without the other biological parent.

Given the manifest ills of fatherless parenting, the State has a compelling interest in sending a powerful message to women that, whenever possible, marriage to the fathers of their children is very important to the welfare of those children and to society itself.  By the same token, the State has a powerful interest in encouraging fathers to marry the mothers of their children.  Redefining marriage to include same-sex couples would undermine that message.  It would suggest that fathers and mothers are interchangeable, that the absence of one or the other is inconsequential, and therefore that there is no particular need for a single parent to marry the father or mother of his or her child, or

to marry someone else who will (ideally through adoption) provide the gender complementarity the child needs.[40]

**Second,** for similar reasons, the loss of the State's clear message in favor of biological mother-father parenting within marriage would likely result in a higher percentage of couples conceiving children without the stability that marriage would otherwise bring. That too would result in less parenting within the State's preferred parenting model. As a practical matter, that would mean primarily more fatherless parenting, with the recognized ills that model often visits on mother and child alike.

**Third,** replacing the child-centric or "conjugal" view of marriage with a more adult-centric view would undermine the existing social norm that often leads parents in acceptable but not ideal marriages to make self-sacrifices and *remain* married to the parents of their children.

---

[40] This is one reason that a large group of prominent scholars from all relevant academic fields has expressed "deep[ ] concerns about the institutional consequences of same-sex marriage for marriage itself." Witherspoon Institute, *Marriage And The Public Good, supra,* at 18-19, App. 507-508. Among other things, they show that "[s]ame-sex marriage . . . would undermine the idea that children need both a mother and a father, further weakening the societal norm that men should take responsibility for the children they beget." *Id.* at 19, App. 508; Glenn, *The Struggle For Same-Sex Marriage*, *supra,* at 26 (expressing concern about "politically motivated denial of the value of fathers for the socialization, development, and well being of children").

Over time, this too would likely lead to more children being raised—and for longer periods—without both of their biological parents.

***Fourth,*** by shifting the understanding of marriage to a more adult-centric view, the redefinition ordered by the district court would also undermine the current social norm (weakened though it may be) that those who wish to have children—or to engage in conduct that could lead to children—*should* get married.  If marriage is about accommodating the needs and desires of adults rather than meeting the needs of children (and society), then it is no longer an obligation–something one is supposed to do if one wants to have children.  Rather, it is simply an option, to be chosen if, but only if, it is what one wants or what one thinks will make one happy.[41]

---

[41] *See, e.g.,* Andrew J. Cherlin, *The Deinstitutionalization of American Marriage*, 66 J. Marriage & Fam. 848, 848, 850, 853, 858 (2004)  (explaining that "weakening of the social norms that define people's behavior in … marriage" shifts the focus of marriage from serving vital societal needs (including the needs of children) to facilitating the personal fulfillment of individuals and could even culminate, in the fading away of marriage, to the point that it becomes "just one of many kinds of interpersonal romantic relationships"); Glenn, *The Struggle for Same-Sex Marriage*, *supra,* at 25-26 (explaining that the historical purposes of marriage—"regulation of sexual activity and the provision for offspring that may result from it"—have already been weakened by the "blurring of the distinction between marriage as an institution and mere '"close relationships,"' and warning  that "acceptance of the arguments made by some advocates of same-sex marriage would bring this trend to its logical conclusion, namely, the definition of marriage as being for the benefit of those who enter into it rather than as an

***Fifth,*** and most obviously, a genderless definition of marriage would likely increase the number of children being raised by same-sex parents. That could happen because the couple decides to raise together an existing child of one of the partners. Or it could result from the conception of a new child through surrogacy or sperm-donation. Either way, such children will not benefit from the State's preferred mother-father parenting model; often they will have no way of knowing even the identity of both biological parents. And recent evidence on same-sex parenting, while not conclusive, indicates that same-sex parenting arrangements are less effective than married biological mothers and fathers in producing positive outcomes in the lives of their children.[42]

---

institution for the benefit of society, the community, or any social entity larger than the couple").

[42] *See* Regnerus, *How Different Are the Adult Children of Parents Who Have Same-Sex Relationships?, supra,* at 752-770, App. 1218; (finding significant differences between children raised by married mothers and fathers and those raised in other family structures, including those raised by same-sex couples). Regnerus, *Answering Critics of the New Family Structures Study with Additional Analysis*, *supra,* at 1367, App. 1238; *see also id.* at 1377, App. 1248; ("Until much larger random samples can be drawn and evaluated, the probability-based evidence that exists—including additional NFSS analyses herein—suggests that the biologically-intact two-parent household remains an optimal setting for the long-term flourishing of children."). Indeed, researchers have noted that many of the studies purporting to show no difference in parenting suffer from deep methodological flaws. *See, e.g.,*

**Sixth,** if the traditional male-female aspect of marriage were thrown out as irrational, it would likely become more difficult to resist other innovations that would lead to additional children being raised without a father or mother. As one of the same-sex marriage advocates quoted in Justice Alito's *Windsor* opinion put it, "conferring the legitimacy of marriage on homosexual relations will introduce an implicit revolt against the institution into its very heart . . . . For starters, if homosexual marriage is OK, why not group marriage[?]." Ellen Willis, *Can Marriage Be Saved?* A Forum, The Nation 16 (2004), cited in *Windsor*, 133 S. Ct. at 2716 n.6 (Alito, J., dissenting).[43] To the

---

Loren D. Marks, *Same-Sex Parenting and Children's Outcomes: A Closer Examination of the American Psychological Association's Brief on Lesbian and Gay Parenting*, 41 Soc. Sci. Research 735, 748 (2012), App. 1263; (noting significant flaws in 59 studies conducted on same-sex parenting that involved small, convenience samples and that the generalized claim of no difference was "not empirically warranted"); *see also Lofton*, 358 F.3d at 325 (noting critiques of these studies, including "significant flaws in the[se] studies' methodologies and conclusions, such as the use of small, self-selected samples; reliance on self-report instruments; politically driven hypotheses; and the use of unrepresentative study populations consisting of disproportionately affluent, educated parents.")

[43] *Accord, e.g.,* Judith Stacey, *In the Name of the Family: Rethinking Family Values in the Postmodern Age* 122-23, 126-27 (1996); *id.* at 127 ("If we begin to value the meaning and quality of intimate bonds over their customary forms, there are few limits to the kinds of marriage and kinship patterns people might wish to devise. . . . [P]erhaps some might dare to question the dyadic [i.e., two-person] limitations of Western marriage and seek some of the benefits of extended family life through small-group marriages . . . .").

extent they involve people of both sexes, such arrangements are especially likely to produce children who will not be raised by one or both of their biological parents, much less by a man-woman couple. The State cannot simply ignore the risks to children arising from such institutional developments which advocates of same-sex marriage *themselves* predict will happen if that change were adopted.

***Seventh,*** a court-ordered redefinition of marriage could well lead to its wholesale "privatization"—for example, by enactment of a civil-union regime for all couples, with religious and other organizations being free to offer the title of "marriage" as they see fit. Commentators from across the political spectrum—including some gay-rights groups—have advocated for that and other forms of governmental retreat from the whole subject of marriage.[44] In Utah and elsewhere, judicial

---

[44] *E.g.,* Clarence Page, *An odd push to privatize marriage*, Chicago Tribune (April 3, 2013) *http://articles.chicagotribune.com/2013-04-03/news/ct-oped-0403-page-20130403_1_ron-paul-licenses-should-government*; Press Release, *Congressman Bob Barr's Remarks at 2011 Log Cabin National Convention* (April 30, 2011) *http://www.logcabin.org/pressrelease/congressman-bob-barrs-remarks-at-2011-log-cabin-national-convention/*; Froma Harrop, *Take Government out of the Marriage Business*, Real Clear Politics (July 2, 2013) http://www.realclearpolitics.com/articles/2013/07/02/take_government_out_of_the_marriage_business_119046.html; Keith Ablow, *When It Comes to Marriage, Government Should Divorce Itself*, Fox News (March 27, 2013)

invalidation of the traditional definition of marriage could well create a broad political consensus for such a radical step.

Such a development—and the consequent reduction in governmental encouragement for marriage—could well cause a substantial decline in the public's interest in marriage, similar to the decline already seen in many parts of Europe. For example, a 2002 survey by the International Social Survey Programme reported that only 15.7 percent of Swedes, 16.9 percent of Belgians and 22.7 percent of Netherlanders believed that "married people are generally happier." Even more troubling, only 30.9% of Swedes, 31.5% of Belgians, and a mere 25.3% of Netherlanders thought "people who want children ought to get married."[45] Not surprisingly, marriage participation rates in these three nations are similarly low.[46] Any social institution with so

---

http://www.foxnews.com/opinion/2013/03/27/when-it-comes-to-marriage-government-should-divorce-itself/.

[45] International Social Survey Programme, *Family and Changing Gender Roles III: 2002,* ZA Study 3880 at 26-27, 30-31 (September 2004).

[46] In 2011, the marriage rate per 1,000 population in Belgium was 4.1, in the Netherlands it was 4.3, and in Sweden it was 5.0. *See* European Commission, *Crude Marriage Rate, Selected Years, 1960-2011* at http://epp.eurostat.ec.europa.eu/statistics_explained/index.php?title=File:Crude_marriage_rate,_seleted_years,_1960-2011_(per_1_000_inhabitants).png&filetimestamp=20130130111229. By

little public support and participation has lost much of its societal value and can no longer serve as effectively as an instrument of social policy.[47]

There are good reasons to believe that over time, the redefinition of marriage ordered by the district court could do just that. The kind of "privatization" just discussed would provide one mechanism. And if marriage is privatized, or if it comes to be understood as primarily for the benefit of adults rather than children, then those who wish to have children (or to engage in conduct that could lead to children) may choose not to marry if they believe other social arrangements would better serve their individual needs. Given the stakes—especially for children—the State has a compelling interest in minimizing that risk.

**Mutually exclusive conceptions of marriage.** In sum, given the strong connection in Utah law and culture between marriage and children, redefining marriage in genderless terms would seriously

---

comparison, Utah's 2011 marriage rate was 8.6 and the national average was 6.8. *See* Centers for Disease Control & Prevention, *Marriage Rates by State: 1990, 1995, and 1999-2011* at http://www.cdc.gov/nchs/data/dvs/marriage_rates_90_95_99-11.pdf.. Given Utah's young population, the real divergence would likely be even starker.

[47] *See, e.g.,* Allan Carlson, *Deconstruction of Marriage: The Swedish Case*, 44 San Diego L. Rev. 153, 154 (2007) (Sweden's experience is one of "the deliberate political elimination of marriage as a meaningful legal and social institution").

undermine, if not destroy, the State's message that biological mother-father parenting is best for children. How can the State insist that fathers (or mothers) are essential to their children's well-being if it is forced to redefine marriage to make fathers (or mothers) optional? Or how can the State insist that fathers and mothers are not interchangeable when its own marriage law effectively makes them interchangeable?

That is not to say that the State lacks compassion for the children of single parents or couples in same-sex relationships. State officials and community leaders remain concerned with their welfare, just as they are concerned with the welfare of every child. A panoply of public and private welfare programs, from subsidized healthcare to childhood education, reflects that concern. But the demand that marriage be redefined to include same-sex couples forces a difficult choice between mutually exclusive conceptions of marriage—one aimed at affirming adult-chosen relationships or one that is child-centric, binding a mother, a father, and their child in a legal institution. Each conception carries unavoidable and unintended costs. Yet in the considered judgment of the State and its people, the costs and risks—especially to

children generally—of redefining marriage in genderless terms vastly outweigh the costs of preserving the traditional definition.

Such difficult and often painful decisions are at the heart of the State's authority over domestic-relations matters.  Utah's citizens and legislators have weighed the competing interests—including the compelling interest in the welfare of all the State's children—and have chosen the policy they believe to be sound.  That choice should be respected.

> **3.    Utah's man-woman definition furthers the State's vital interest in ensuring adequate reproduction by parents willing and able to provide a high-quality home environment for their children.**

Utah has a strong and compelling interest not only in the quality of parenting its children receive, but also in the *number* of children who will be conceived in the future and raised in high-quality home arrangements.  Societies with low birthrates eventually suffer a host of problems—from reduced economic growth and dynamism, to inadequate funding for critical social welfare programs, to depopulation of communities, historic cities and even the nation itself.[48]  In the

---

[48] *See, e.g.,* Lynn Wardle, *"Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation*, 24 Harvard J. L. & Pub. Pol'y 771, 784-86 (2001).

developed world, moreover, depopulation is a serious, present concern:

Birth rates in the United States and in many other countries have

fallen to below replacement levels, "raising the specter of a future ratio

of dependent aged (mostly retired) persons to working aged Americans

that portends burdens upon the national economy."[49]

**Correlation between genderless marriage and lower**

**birthrates.** The need to ensure adequate procreation is one reason

why, since time immemorial, and even in societies that embraced

homosexual liaisons, marriage has always been conceived as a union of

a man and a woman *for the purpose of having children*.[50] That is also

why the Supreme Court has repeatedly reiterated that man-woman

marriage is "fundamental to our very existence and survival." *Loving*

---

[49] Wardle, *Multiply and Replenish, supra*, at 789; *see also See* Jean-Pierre Guengant, *The Proximate Determinants During the Fertility Transition*, http://www.un.org/en/development/desa/population/publications/pdf/fertility/completing-fertility/2RevisedGUENGANTpaper.PDF (last visited Jan. 24, 2014); *see also* Central Intelligence Agency, *Country Comparison: Total Fertility Rate*, The World Factbook, https://www.cia.gov/library/publications/the-world-factbook/rankorder/2127rank.html (last visited Jan. (last visited Jan. 24, 2014) (listing fertility rates worldwide).

[50] Wardle, *Multiply and Replenish, supra* at 784-86 (discussing ancient Roman and Greek marriage laws and traditions and citing authorities).

at 12; *Zablocki* at 384; *Skinner* at 541; *Maynard v. Hill,* 125 U.S. 190, 211 (1888).

It is also striking that fertility and birthrates tend to be markedly lower in nations and states that have embraced same-sex marriage. For example, the birthrate in states (and Washington, D.C.) that have adopted a genderless marriage definition is significantly lower than the national average.  In fact, the six lowest birthrate states have all adopted that redefinition, while none of the nine highest birthrate states have done so.[51]

Demographers have shown that, for a society to maintain a constant population over time, it must achieve a fertility rate—the average number of children born to a woman over her lifetime—of approximately 2.1.[52]  The national average in the United States is 2.06,

---

[51]    Joyce A. Martin, et al., Ctrs. for Disease Control & Prevention, *National Vital Statistics Reports—Births: Final Data for 2012,* Table 12 (December 30, 2013), http://www.cdc.gov/nchs/data/nvsr/nvsr62/nvsr62_09.pdf  (The six lowest:  Connecticut (10.2), Maine (9.6), Massachusetts (10.9), New Hampshire (9.4), Rhode Island (10.4), and Vermont (9.6).  The nine highest: Alaska (15.3), Idaho (14.4), Kansas (14.0), Nebraska (14.0), North Dakota (14.4), Oklahoma (13.8), South Dakota (14.5), Texas (14.7), and Utah (18.0)).

[52] *See* Guengant, *supra*, at http://www.un.org/en/development/desa/population/publications/pdf/fertility/completing-fertility/2RevisedGUENGANTpaper.PDF.

already somewhat less than the replacement rate.[53]  But the average in states that have adopted a genderless marriage definition is 21 basis points below that level—at 1.85.  As of 2010, moreover, Massachusetts—the first State to take this step— has an even lower fertility rate of just 1.67—which is down 13 basis points from its level in 2000, shortly before marriage was redefined there.[54]

---

[53] Cent. Intelligence Agency, *Country Comparison: Birth Rate*, The World Factbook, https://www.cia.gov/library/publications/the-world-factbook/rankorder/2054rank.html (last visited January 31, 2014), https://www.cia.gov/library/publications/the-world-factbook/rankorder/2054rank.html;); and Cent. Intelligence Agency, *Country Comparison: Total Fertility Rate*, The Word Factbook (last visited January 31, 2014), https://www.cia.gov/library/publications/the-world-factbook/rankorder/2127rank.html.  The average total fertility rate ("TFR") for all Organization for Economic Co-operation and Development ("OECD") countries is 1.6.  *See* OECD, Social Policy Division, Directorate of Employment, Labour and Social Affairs, *SF2.1: Fertility rates*, OECD Family Database (June 26, 2013), http://www.oecd.org/social/family/SF2.1%20Fertility%20trends_updatedJune2013.pdf  (culling TFRs from 2011 data and showing only 6 out of 41 OECD countries with TFRs over 2.1, the population replacement rate).

[54] Within the United States, fertility rates vary greatly, e.g.: California (1.947), Connecticut (1.723), Delaware (1.940), D.C. (1.646), Hawaii (2.153), Illinois (1.882), Iowa (2.009), Maine (1.700), Maryland (1.999), Massachusetts (1.665), Minnesota (1.961), New Hampshire (1.666), New Mexico (2.064), New Jersey (1.900), New York (1.814), Rhode Island (1.630), Vermont (1.664), and Washington (1.907).  *See* Ctrs. for Disease Control & Prevention, *National Vital Statistics Reports—Births: Final Data for 2010*, 42 (Aug. 28, 2012), http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_01.pdf.  In 2000, before same-sex marriage was adopted in Massachusetts, that state had a birthrate of 1.8.  *See* Ctrs. for Disease Control & Prevention, *National Vital Statistics Reports—Births: Final Data for 2000*, 40 (Feb. 12, 2002), http://www.cdc.gov/nchs/data/nvsr/nvsr50/nvsr50_05.pdf .

The same is true overseas.  As of 2011, ten countries permitted same-sex marriage.[55]  Six of these ten fall well into the bottom quarter in both birth rates and fertility among 223 countries and territories, and all ten fall below the average worldwide fertility rate.[56]  While these statistics obviously do not prove a causal link between same-sex marriage and declining birthrates, they do create cause for concern.

**How Traditional Marriage Encourages Procreation.**

So far, Utah has been more successful than these states and countries in encouraging procreation.  As of 2010, its fertility rate was 2.45— slightly above the replacement rate.[57]

---

[55] They included the Netherlands, Spain, Canada, Belgium, South Africa, Norway, Sweden, Portugal, Iceland, and Argentina. *See* Dan Fastenberg, *A Brief History of International Gay Marriage*, Time, July 22, 2010, available , at http://www.time.com/time/world/article/0,8599,2005678,00.html.

[56] Cent. Intelligence Agency, *Country Comparison: Birth Rate*, The World Factbook (last visited January 31, 2014), https://www.cia.gov/library/publications/the-world-factbook/rankorder/2054rank.html; and Cent.; and Cent. Intelligence Agency, *Country Comparison: Total Fertility Rate*, The Word Factbook (last visited January 31, 2014), https://www.cia.gov/library/publications/the-world-factbook/rankorder/2127rank.html..

[57] Ctrs. For Disease Control and Prevention, *National Vital Statistics Reports—Births: Final Data for 2010*, Table 12 (Aug. 28, 2012), http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_01.pdf.

While a number of factors contribute to Utah's success, one of those is undoubtedly its marriage laws—including their limitation to man-woman couples.  By providing special privileges and status to couples that are uniquely capable of producing offspring without biological assistance from third parties, the State sends a clear if subtle message to *all* of its citizens that natural reproduction is healthy, desirable and highly valued.  That message fosters more reproduction, even as it encourages the couples so engaged to raise the resulting children within man-woman marriages.

Additional reinforcement comes from the general perception that Utah's marriage laws and traditions have been built on the child-centric view of marriage rather than the more adult-centric view.   Because of that, Utah's marriage laws and traditions subtly convey to all citizens that it is good to make the sacrifices necessary to have children—even though doing so may be inconvenient or even burdensome to adult parents.  That message too has an upward influence on fertility.

As implemented in Utah, then, the very institution of man-woman marriage stands as a State endorsement not only of the value of raising children in intact marriages, but also of the value of procreation.   For

that reason too, the State has a powerful interest in retaining that traditional definition.

**Effects of genderless marriage.**  By contrast, redefining marriage in genderless terms would tend to reduce fertility rates, for at least three reasons.

*First,* as many commentators have observed, because procreation is an inherently gendered matter, redefining marriage in genderless terms breaks the critical conceptual link between marriage and procreation—and in that way alone would dilute the implicit encouragement the institution of marriage currently provides for procreation by married couples.

*Second,* by implicitly endorsing the adult-centric model of marriage, a genderless redefinition would send a powerful message that it is entirely appropriate—even expected—for adults to forego or severely limit the number of their children based on concerns for their own convenience.  That a new child might "cramp the style" of an adult would come to be seen as sufficient reason not to have the child at all. That too would tend to reduce fertility rates.

*Third,* to the extent a genderless marriage definition encourages the further abandonment—or privatization—of marriage, it would

almost certainly reduce birthrates.  Studies have shown that cohabiting

couples tend to produce fewer children on average than married couples

do[58]—perhaps because the resulting instability makes the participants

less willing to bring children into the mix.  Thus, if overall marriage

rates decline further, birthrates would likely decline as well.

At a minimum, these institutional and biological realities strongly

suggest that abandoning Utah's marriage definition would create or

increase the *risk* of such a decline.  That is especially true in Utah,

which has thus far been more successful than other states at countering

other social and economic pressures that have tended to reduce the

marriage rate and, with it, the fertility rate.  Yet for reasons just

explained, the State has good reason to fear that a judge-imposed

redefinition—and the changes to the public meaning of marriage such a

redefinition would entail—would over time weaken its marriage

tradition enough to reduce its fertility rate, perhaps even below the

---

[58] Junfu Zhang and Xue Song, *Fertility Differences between Married and Cohabiting Couples: A Switching Regression Analysis*, IZA Discussion Paper No. 3245 (December 2007), SSRN: http://ssrn.com/abstract=1136407; Elizabeth Brown and Alfred Dittgen, Fertility of married and unmarried couples (2000), Paper 4.4 presented at United Nations Economic Commission for Europe Conference, Brussels, Belgium, May 2000, http://www.unece.org/fileadmin/DAM/pau/_docs/ffs/FFS_2000_FFConf_Contri Brown-Dittgen.pdf.

replacement rate.  Utah has a compelling interest in minimizing that risk, and therefore in preserving its gendered definition of marriage.

**4.    Preserving Utah's marriage definition furthers the State's vital interests in accommodating religious freedom and reducing the potential for civic strife.**

Yet another vital public welfare interest arises from the fact that husband-wife marriage is deeply interwoven into the fabric of Utah life, including its diverse faith communities.  Accordingly, preserving the traditional definition of marriage is essential to preserving social harmony in the State, while redefining marriage would be a recipe for social and religious strife, centered on the instrumentalities of State and local government.  *Cf. Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983) (referring to "the States' compelling interest in the maintenance of domestic peace").

**Religious and cultural support for marriage.**  The social consensus surrounding marriage reflects, in part, powerful religious symbolism and traditions through which Utah's diverse faith communities foster and nourish marriage as the ideal institution for family life.  That nearly ubiquitous religious support is an essential pillar in the social infrastructure that sustains Utah's marriage rates— as well as the consensus that marriage is the best venue for bearing and

rearing children.  Of course, the State endorses no religious beliefs about marriage.  Yet its interests are plainly advanced by the religious and other cultural institutions that support its pro-marriage culture.

Broad religious support for marriage, however, exists only because the current legal definition corresponds to the understanding of the vast majority of faith communities.  That includes approximately 20 of the 25 largest faith communities in Utah, plus others accounting (in the aggregate) for 75% or more of the State's population—and some 98% of those who consider themselves religious believers.[59]

---

[59] Of the 25 largest faith communities in Utah, only five—the Episcopal Church, the Presbyterian Church (USA), the Evangelical Lutheran Church, Reform Judaism and the United Church of Christ—officially accept same-sex unions as theologically permissible for their members.  *Compare* Ass'n of Religion Data Archives, *State Membership Report*, http://www.thearda.com/rcms2010/r/s/49/rcms2010_49_state_rate_2010.asp (last visited Jan. 31, 2014) (reporting membership statistics for Utah faith groups) *with* Pew Research Religion & Pub. Life Project, *Religious Groups' Official Positions on Same-Sex Marriage* (Dec. 7, 2012), http://www.pewforum.org/2012/12/07/religious-groups-official-positions-on-same-sex-marriage/ (describing official positions of various faith groups on same-sex marriage).  These five groups, moreover, are among the smaller faith groups in Utah—accounting for less than one percent of the population.  *See* Ass'n of Religion Data Archives, *supra*.  The other faith groups in the top 25—including the Church of Jesus Christ of Latter-day Saints (approximately 55 percent of the population), the Roman Catholic Church (approximately 5 percent), and virtually all evangelical Christian faiths (about 2.3 percent in the aggregate)—object to same-sex marriage on theological grounds.  Approximately 20 percent of Utah's population claims no religious affiliation.

In that regard, the religious context surrounding same-sex marriage is vastly different from the religious context that surrounded interracial marriage—a difference that once again illustrates the unwarranted logical leap that the district court took in invoking *Loving*. Historically, objections to interracial marriage were always principally about racism, not about religion or the marriage institution.

By contrast, religious support for defining marriage as between one man and one woman is both widespread and deeply rooted in the religious texts of all three major Abrahamic faiths—Christianity, Judaism, and Islam—plus one of the other two largest world religions—Buddhism.[60]  The Abrahamic faiths in particular have rich religious narratives extolling the husband-wife, child-centric meaning of marriage.  Millions of Utahns who accept these traditions understand marriage and sexuality as gifts from God, designed not principally for the gratification of adults (i.e., adult-centric), but to provide an optimal

---

[60] *See* Pew Research Religion & Pub. Life Project, *Religious Groups' Official Positions on Same-Sex Marriage*, (Dec. 7, 2012), http://www.pewforum.org/2012/12/07/religious-groups-official-positions-on-same-sex-marriage/..

setting for bearing and raising children (i.e., child-centric).[61]

These beliefs about marriage are not going away. They are held by major worldwide religious bodies, with billions of believers, that are unlikely to change their doctrines based on the views of the U.S. public, much less the U.S. courts. These beliefs are tied not only to theology but also to religious and family practices, deeply and sincerely held personal beliefs, and entire ways of life. They are no less integral to the dignity and identities of millions of Utah citizens than Plaintiffs' sexual orientation is to them.

Given those realities, judicial imposition of a genderless definition of marriage would fracture the centuries-old consensus about the meaning of marriage, spawning deep tensions between civil and religious understandings of that institution, and all to the detriment of both marriage and the State's interests in social peace.

**Avoiding religion-centered conflicts.** Redefining marriage in genderless terms would create the potential for religion-related strife—and infringements of religious freedom—in a wide variety of government-related situations that have already arisen around the

---

[61] *See e.g.*, Sex, Marriage and Family in World Religions xxii-xxvii (Don S. Browning, M. Christian Green & John Witte, Jr. eds., 2009).eds., 2009).

country.  Scholars across the ideological spectrum agree on the threat.[62]

Indeed, as a group of pro-same-sex-marriage law professors recently put it to the Illinois legislature, the kind of redefinition imposed by the district court here "could create a whole new set of problems for the religious liberty of those religious believers who cannot conscientiously participate in implementing the new regime."[63]  To take just a few examples:

- Governments would likely be pressured—and perhaps agree—to force religious social service agencies to cease providing adoption and foster care services unless they agree to provide those services in a manner contrary to their doctrines and beliefs.[64]

---

[62] *See generally Same-Sex Marriage and Religious Liberty:  Emerging Conflicts* (Douglas Laycock et al. eds., 2008) (diverse scholars discussing issue); *see id.* at 124-25 (Professor Chai Feldblum, LGBT scholar and current commissioner of the federal EEOC, noting that there is often a "conflict . . . between laws intended to protect the liberty" of LGBT people "and the religious beliefs of some individuals whose conduct is regulated by such laws," and that sometimes "those who advocate for LGBT equality have downplayed the impact of such laws").

[63] Letter from Douglas Laycock, Michael Perry, and Mark D. Stern to Representative Michael Madigan (Mar. 11, 2013) .

[64] *See, e.g.,* Michelle Boorstein, *Citing Same-Sex Marriage Bill, Washington Archdiocese Ends Foster-Care Program*, Washington Post  (Feb. 17, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/02/16/AR2010021604899.html17, 2010), ; Emily Esfahani Smith, *Washington, Gay Marriage and the Catholic Church*, Wall Street Journal (Jan. 9, 2010), http://online.wsj.com/article/SB10001424052748703478704574612451567822852.html;   Manya A. Brachearm, *Rockford Catholic Charities Ending Foster Care,* Chicago Tribune (May 26, 2011),

- Governments would likely be pressured—and perhaps agree—to revoke the tax-exempt status of churches or other non-profit religious organizations that refuse on religious grounds to recognize same-sex marriages or to provide benefits to same-sex couples on the same terms as husband-wife couples.[65]

- Governments would likely be pressured—and perhaps agree—to investigate, prosecute and punish people in wedding-related businesses for refusing on religious conscience grounds to assist with same-sex weddings.[66]

- Governments would likely be pressured—and perhaps agree—to punish school teachers for refusing on religious conscience

---

http://www.chicagotribune.com/news/local/breaking/chibrknews-rockford-catholic-charities-ending-foster-care-adoptions-20110526,0,4532788.story?track=rss; Daniel Avila, *Same-Sex Adoption in Massachusetts, the Catholic Church, and the Good of the Children: The Story Behind the Controversy and the Case for Conscientious Refusals* 27 Children's Legal Rights J. 1, 11 (2007); John Garvey, *State Putting Church Out of Adoption Business,* Boston Globe, (March 14, 2006),1, 11 (2007); John Garvey, *State Putting Church Out of Adoption Business,* Boston Globe, March 14, 2006, at A15.

[65] *Cf. Bob Jones University v. United States,* 461 U.S. 574 (1983);); *Religious Establishment Bigots Sound Alarm Against Loving Same-Sex Marriages,* The Daily Kos (Jan. 12, 2012), http://www.dailykos.com/story/2012/01/12/1054208/-Religious-establishment-bigots-sound-alarm-against-loving-same-sex-marriages ("These religious bigots want to receive taxpayer support for their efforts, but want to keep discriminatory practices in place. . . . . Their right to be bigots isn't in question. What's in question is whether American taxpayers should subsidize that bigotry. And the answer, quite obviously, should be a resounding NO.").

[66] *See Elane Photography, LLC v. Willock,* 309 P.3d 53 (N.M. 2013)) (upholding fine despite refusing on religious grounds to photograph same-sex commitment ceremony).

grounds to endorse same-sex marriage or for expressing contrary views.[67]

- Government licensing agencies would likely be pressured—and perhaps agree—to investigate and punish counselors for refusing on religious conscience grounds to counsel same-sex married couples on the same terms as heterosexual couples.[68]

- Religion-based conflicts between public schools and parents would likely increase as children are taught about sexuality and marriage in ways that contravene parents' and students' deeply held religious beliefs.[69]

- Governments would likely be pressured—and might agree—to punish religious colleges and similar institutions for adhering to

---

[67] *See, e.g.*, Todd Starnes, *Christian Teacher Under Investigation for Opposing Homosexuality*, Fox News Radio (Oct. 19, 2011), http://radio.foxnews.com/toddstarnes/ top-stories/christian-teacher-under-investigation-for-opposing-homosexuality.html (teacher investigated for posting message on private Facebook page opposing homosexuality based on her Christian faith; statewide gay rights group demanded her removal and governor criticized her publicly).

[68] *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012).

[69] *Compare Teacher, School Sued Over Gay Fairy Tale*, NPR (April 27, 2006), http://www.npr.org/templates/story/story.php?storyId=5366521 (legalization of SSM in Massachusetts basis for reading book depicting marriage of two princes), *with* Todd Starnes, *Atty Says School Threatened, Punished Boy Who Opposed Gay Adoption*, Fox News Radio, http://radio.foxnews.com/toddstarnes/top-stories/atty-says-school-threatened-punished-boy-who-opposed-gay-adoption.html (last visited Feb. (last visited Feb. 1, 2014) (student berated by school district superintendent after writing op-ed piece in school newspaper opposing gay adoptions; boy called to superintendent's office, subjected to hours of meetings, and accused of violating the school's anti-bullying policy; superintendent threatened suspension, demanded that student admit to "regret" over column, and called student "ignorant").

their views on marriage in such things as married student housing, hiring, and curriculum.[70]

Preventing these kinds of social tensions and conflicts—and the infringements of religious freedom they could create—is an important and compelling State interest, legitimately grounded in the State's concern for public welfare. *See Bill Johnson's Restaurants, supra,* at 741. As Justice Breyer remarked in *Zelman v. Simmons-Harris*, 536 U.S. 639, 717 (2002) (Breyer, J., dissenting), one of the concerns underlying the federal Establishment Clause is "protecting the Nation's social fabric from religious conflict." *Accord Van Orden v. Perry,* 545 U.S. 677, 698-99 (2005) (Breyer, J., concurring). If that is a legitimate *federal* interest, based as it is on the federal First Amendment, then surely the State has a compelling interest in doing what it can to protect the State's own "social fabric from religious conflict."

That is not to say that the State can invoke concerns about religious freedom or religion-related social strife as a basis for denying rights otherwise guaranteed by the Constitution. Yet for reasons already explained, the right to same-sex marriage claimed here is

---

[70] *See, e.g., Levin v. Yeshiva Univ.*, 754 N.E.2d 1099 (N.Y. 2001); *see generally* D. Smith, *Accreditation Committee Decides to Keep Religious Exemption*, 33 Monitor on Psychology 16 (Jan. 2002).

anything but well-established. Instead, as the district court itself recognized, the existence of a constitutional right to same-sex marriage hinges on whether the State has sufficient reason for defining marriage in gendered terms. The State's interests in protecting religious freedom and minimizing religion-related civic conflicts are thus highly relevant to the constitutional inquiry.

**The value of democratic decision-making.** Avoiding such conflicts, moreover, is another reason the State has a profound interest in having disagreements over the nature and purpose of marriage resolved through democratic institutions. The risk of deep social division is at its apex when courts preempt democratic discourse and force major social changes on an unwilling populace.

By contrast, democratic channels allow for dialogue, persuasion, incremental steps, creative compromises, second and third chances and, sometimes, reaffirmations of established ways. While it cannot guarantee everyone's preferred outcome, this "active liberty," as Justice Breyer has called it—the right to participate as equal citizens in democratic decision-making about how best to live out our common

destiny[71]—ensures a legitimacy in lawmaking that judicial mandates cannot match.  The State has the highest interest in preserving the right of the People and their democratic institutions to resolve controversial issues in a way that secures the greatest possible consensus and harmony.

Same-sex marriage is a classic example.  To say that people hold divergent views about marriage is an understatement.  As previously explained, some believe marriage is focused principally on the emotional fulfillment of adults, and that moms and dads are interchangeable.  Others believe marriage is principally about children, and that they benefit from being raised by both a mom and a dad.  As this Court is well aware, democratic processes are ill-served when the judiciary steps into such a contentious debate and, as the district court did, labels one side as "irrational."  To do so improperly dismisses as intolerant the personal and religious beliefs of at least half the country.  That is not the place or function of the judiciary.  Such debates are

---

[71]"[T]he Constitution [is] centrally focused upon active liberty, upon the right of individuals to participate in democratic self-government."  Stephen G. Breyer, *Active Liberty:  Interpreting Our Democratic Constitution* 21 (2005). Justice Breyer urges "that courts should take greater account of the Constitution's democratic nature when they interpret constitutional and statutory texts."  *Id.* at 5.  Judicial restraint – *i.e*, "judicial modesty in constitutional decision-making" – is essential.  *Id.* at 37; *see also id.* at 17.

properly reserved for the political branches or for the People speaking at the ballot box.

Utah's marriage policy, moreover, does not dictate the private choices of its citizens. The Supreme Court has long acknowledged a "basic difference between direct state *interference* with a protected activity and state *encouragement* of an alternative activity consonant with legislative policy." *Maher v. Roe*, 432 U.S. 464, 475 (1977) (emphasis added). By defining marriage as being between one man and one woman, Utah does not interfere with adults' ability to commit to an exclusive, loving relationship with others of the same sex, or to bring children into that relationship. Instead, the laws at issue here simply *encourage* a familial structure that has served society for thousands of years as the ideal setting for raising children. Nothing in the federal Constitution prevents Utah's citizens from making that choice.

**\* \* \* \* \***

Nearly 130 years ago, in *Murphy v. Ramsey*, 114 U.S. 15, the Supreme Court held that "no legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth . . . than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from the union for

life of one man and one woman …" *Id.* at 45 (emphasis added).  That was true then, and it remains true today:  For all the reasons discussed above, the State has important and *compelling* interests in retaining its gendered definition of marriage.  A fortiori, it has the required rational basis for doing so.

## CONCLUSION

Accordingly, this Court should reverse the district court's grant of summary judgment to the Plaintiffs, and vacate the permanent injunction.

## STATEMENT REGARDING ORAL ARGUMENT

Given the importance of the legal and policy issues at stake, oral argument is respectfully requested.

Date: February 3, 2014.

Respectfully submitted,

/s/ Gene C. Schaerr
GENE C. SCHAERR
Special Asst. UT Attorney General
BRIAN L. TARBET
Chief Deputy UT Attorney General
PARKER DOUGLAS
Chief of Staff & Counsel General
STANFORD E. PURSER
PHILIP S. LOTT
Assistant UT Attorneys General
160 East 300 South
Salt Lake City, Utah 84114-0856
801-366-0100 (phone)
gschaerr@gmail.com

JOHN J. BURSCH
Warner Norcross & Judd LLP
111 Lyon Street, NW. Ste. 900
Grand Rapids, Michigan 49503
616-752-2474
jbursch@wnj.com

MONTE N. STEWART
12550 W. Explorer Dr., Ste. 100
Boise, Idaho 83713
208-345-3333
stewart@stm-law.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.　　This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

　　[x]　　this brief contains 21,745 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

　　[x]　　this brief has been prepared in a proportionally spaced typeface using Word in 14 point Times New Roman font.

　　　　　　　　/s/ Gene Schaerr　　　　　　　

## ECF CERTIFICATIONS

Pursuant to Section II(I) of the Court's CM/ECF User's Manual, the undersigned certifies that:

1.　　all required privacy redactions have been made;

2.　　hard copies of the foregoing brief required to be submitted to the clerk's office are exact copies of the brief as filed via ECF; and

3.　　the brief filed via ECF was scanned for viruses with the most recent version of Microsoft Security Essentials v. 2.1.111.6.0, and according to the program is free of viruses.

　　　　　　　　/s/ Gene Schaerr

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd of February, 2014, a true, correct and complete copy of the foregoing Brief of Appellants and Addendum was filed with the Court and served on the following via the Court's ECF system:

Peggy A. Tomsic                    tomsic@mgplaw.com
James E. Magleby                   magleby@mgplaw.com
Jennifer Fraser Parrish            parrish@mgplaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, UT 84101


Kathryn D. Kendell                 kkendall@nclrights.org
Shannon P. Minter                  sminter@nclrights.org
David C. Codell                    dcodell@nclrights.org
National Center for Lesbian Rights
870 Market St., Ste. 370
San Francisco, CA 94102


Ralph Chamness                     rchamness@slco.org
Darcy M. Goddard                   dgoddard@slco.org
Salt Lake County District Attorneys
2001 South State, S3700
Salt Lake City, UT 84190


                        /s/ Gene Schaerr

104

# ADDENDA

1.    Memordum Decision and Order dated December 20, 2013.

2.    State Definitions of Marriage:  Statutes, Constitutional
      Provisions and Judicial Decisions