NO. 13-4178

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

DEREK KITCHEN, et al.,
Plaintiffs-Appellees,

*v.*

GARY R. HERBERT, in his official capacity as
Governor of Utah, and SEAH REYES, in his official
capacity as Attorney General of Utah,
Defendants-Appellants,
and
SHERRIE SWENSEN, in her official capacity as
Clerk of Salt Lake County,
Defendant.

Appeal from United States District Court for the District of Utah
D.C. Civil Case No. 2:13-CV-00217-RJS (Honorable Robert J. Shelby)

**BRIEF OF AMICI CURIAE THE CENTER FOR URBAN RENEWAL AND
EDUCATION, THE COALITION OF AFRICAN-AMERICAN PASTORS
USA, AND THE FREDERICK DOUGLASS FOUNDATION, INC.,
SUPPORTING THE DEFENDANTS-APPELLANTS GARY R. HERBERT
AND SEAN REYES IN FAVOR OF REVERSAL**

Stephen Kent Ehat, Esq.
167 North 1150 East
Lindon, Utah 84042
(801) 785-9797
(Counsel of Record)

## FRAP RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Amicus **The Center for Urban Renewal and Education** (CURE) is a California corporation and states that it has no parent corporation, that it issues no stock, and that no publicly held corporation owns any stock of CURE.

Amicus **The Coalition of African American Pastors USA** (CAAP) is not a corporation but is a grass-roots movement of thousands of African-American Christians and clergy seeking to support the institution of marriage and states that it has no parent corporation, that it issues no stock, and that no publicly held corporation owns any stock of CAAP.

Amicus **The Frederick Douglass Foundation, Inc.** (FDFI) is a Maryland corporation, issues no stock and has no parent corporation. Therefore, no publicly held corporation owns any stock of FDFI.

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . viii

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    UNLIKE THE OPPOSITE-SEX DEFINITION OF MARRIAGE, RACIAL
      RESTRICTIONS ON MARRIAGE IMPLICATED THE FOURTEENTH
      AMENDMENT'S CORE CONCERN WITH ELIMINATING RACIAL
      DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   IN AMERICAN LEGAL HISTORY, RACIALLY SEGREGATED MARRIAGE IS
      NOT COMPARABLE TO SEXUALLY INTEGRATED MARRIAGE . . . . . . . . . . . . 9

III.  THE GENDER-INTEGRATING DEFINITION OF MARRIAGE IS CLOSELY
      BOUND UP WITH THE INSTITUTION'S CORE PURPOSE OF INCREASING
      THE LIKELIHOOD THAT EACH CHILD WILL BE BORN TO AND RAISED
      BY BOTH THE MOTHER AND THE FATHER IN A STABLE, ENDURING
      FAMILY UNIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.   THE DUAL-GENDER REQUIREMENT FOR MARRIAGE SUBSTANTIALLY
      ADVANCES THE STATE'S INTEREST IN LINKING RESPONSIBLE
      PROCREATION, ADVANTAGEOUS CHILDBIRTH AND OPTIMAL CHILD
      REARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.    A KEY PURPOSE OF *LOVING* WAS TO DISENTANGLE MARRIAGE FROM
      RESTRAINTS IMPOSED BY PERSONS PURSUING POLICIES EXTRANEOUS
      TO MARRIAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VI.   JUST FIVE YEARS AFTER DECIDING LOVING THIS COURT IN *BAKER V.*
      *NELSON* REJECTED THE CLAIM THAT STATE LAW ALLOWING ONLY
      DUAL-GENDER MARRIAGE VIOLATED *LOVING*; *BAKER* IS GOOD LAW,
      BINDING PRECEDENT AND OUGHT TO BE FOLLOWED . . . . . . . . . . . . . . . . 26

VIII. CONCLUSION: *LOVING* COMPELS REVERSAL . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

**Page**

## Decisions of the United States Supreme Court

*Baker v. Nelson*, 409 U.S. 810 (1972), dismissing for want of a
    substantial federal question the appeal in *Baker v.
    Nelson*, 91 N.W.2d 185 (Minn. 1971) . . . . . . . . . . . . . . . . . . . . . 27-29

*Bartlett v. Strickland*, 556 U.S. 1 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Boddie v. Connecticut*, 401 U.S. 371 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Carey v. Populations Services International*, 431 U.S. 678 (1977) . . . . . . . . 19-20

*Fisher v. Univ. of Texas*, 133 S.Ct. 2411, 2419 (2013) . . . . . . . . . . . . . . . . . . 26

*Gratz v. Bollinger*, 539 U.S. 244 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Griswold v. Connecticut*, 381 U.S. 479 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Grutter v. Bollinger*, 539 U.S. 306 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Johnson v. California*, 545 U.S. 162 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lawrence v. Texas*, 539 U.S. 558 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Loving v. Virginia*, 388 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Maynard v. Hill*, 125 U.S. 190 (1880) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*McLaughlin v. Florida*, 379 U.S. 184 (1964) . . . . . . . . . . . . . . . . . . . . . 10, 11, 17

*Meyer v. Nebraska*, 262 U.S. 390 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Miller-El v. Dretke*, 545 U.S. 231 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## TABLE OF AUTHORITIES—Continued

**Page**

*Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) . . . . . . . . . . . . . . . . . . . . . . 19

*Roe v. Wade*, 410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Skinner v. Oklahoma*, 316 U.S. 535 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Washington v. Davis*, 426 U.S. 229 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Zablocki v. Redhail*, 434 U.S. 374 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

### Decisions of United States Courts of Appeals

*Gill v. Office of Personnel Management*, 682 F. 3d 1 (1st Cir. 2012) . . . . . . . . . 27

*Windsor v. United States*, 699 F. 3d 169 (2d Cir., 2012) . . . . . . . . . . . . . . . 7, 8, 28

### Decisions of United States District Courts

*Jackson v. Abercrombie*, 2012 U.S. Dist. LEXIS 111376 (U.S. Dist. Haw., Aug. 8, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Sevcik v. Sandoval*, 2012 U.S. Dist. LEXIS 169643 (U.S.Dist. Nevada, Nov. 26, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Wilson v. Ake*, 354 F.Supp.2d 1298 (M.D. Fla. 2005) . . . . . . . . . . . . . . . . . . . . 27

### Decisions of State Courts

*Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), appeal dismissed for want of a substantial federal question, 409 U.S. 810 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

## TABLE OF AUTHORITIES—Continued

Page

### Utah Legislative Materials

*Laws of the State of Utah, 1977*, available at http://snipurl.com/
    28iyyrp, at pp. 1-2, last viewed on February 3, 2014 . . . . . . . . .  8 n. 2

### Decision of a British Court

*In re G Children* (FC) [2006] UKHL 43, http://www.publications.
    parliament.uk/pa/ld200506/ldjudgmt/jd060726/child-1.ht
    m (last seen February 3, 2014) . . . . . . . . . . . . . . . . . . . . . . .  16 n. 12

### Miscellaneous Sources, Law Review and Journal Articles,
### Notes, Newspapers, Etc.

I WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND
    *457 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16 n. 12

Cass R. Sunstein, Homosexuality and the Constitution, 70 IND. L.J. 1
    (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11 n. 3

Charles Frank Robinson, DANGEROUS LIAISONS 29 (2006) . . . . . . . . . . . .  13 n. 7

EUROPEAN BIRTH RATES REACH HISTORIC LOW IN PART BECAUSE OF
    RECENT FALL IN EASTERN EUROPE, Sept. 8, 2006,
    available at www.medicalnewstoday.com/releases/
    51329.php (last seen February 3, 2014) . . . . . . . . . . . . . . . .  24 n. 18

George W. Dent, Jr., Straight Is Better: Why Law and Society May
    Legitimately Prefer Heterosexuality, 15 TEX. REV. L. &
    POLITICS (2010), available at http://ssrn.com/abstract=
    1649574 (last seen February 3, 2014) . . . . . . . . . . . . . . . . .  25 n. 20

George Weigel, THE CUBE AND THE CATHEDRAL: EUROPE, AMERICA
    AND POLITICS WITHOUT GOD (2005) . . . . . . . . . . . . . . . . . . .  24 n. 18

**TABLE OF AUTHORITIES—Continued**

**Page**

Lynn D. Wardle & Lincoln C. Oliphant, In Praise of Loving:
*Reflections on the* "Loving *Analogy*" *for Same-Sex
Marriage*, 51 How. L. J. 1117 (2007) . . . . . . . . . . . . . . . . . . . 12 n. 5

Lynn D. Wardle, Loving v. Virginia *and The Constitutional Right to
Marry*, 1790-1990, 41 How. L. J. 289 (1998) . . . . . . . . . . . 20 n. 13

Lynn D. Wardle, *Multiply and Replenish: Considering Same-Sex
Marriage in Light of State Interests in Marital
Procreation*, 24 Harv. J. L. & Pub. Policy 771 (2001) . . . . 24 n. 19

Robert A. Pratt, *Crossing the Color Line: A Historical Assessment
and Personal Narrative of* Loving v. Virginia, 41 How.
L.J. 229 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 n. 14

Stephen L. Carter, *"Defending" Marriage: A Modest Proposal*, 41
How. L.J. 215 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 nn. 4, 5

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

Founded in 1995 by its current president, Ms. Star Parker, **The Center for Urban Renewal and Education** (**CURE**), promotes traditional values, personal responsibility, limited government, and faith, all to address issues of race and poverty. **CURE** delivers its message both to political and thought leaders in Washington and to a national network of black pastors.

**The Frederick Douglass Foundation, Inc.** (**FDFI**) is a public policy and educational organization favoring limited government and the sanctity of the free market as the best tools to address the hardest problems facing our nation. **FDFI** consists of pro-active individuals committed to developing innovative approaches to today's problems with the help of elected officials, university scholars, and community activists.

**The Coalition of African American Pastors USA** (**CAAP**) is a grass-roots movement of tens of thousands of African-American Christians and clergy who believe in traditional family values such as protecting the lives of the unborn and defending the sacred institution of marriage. **CAAP** encourages Christian people of all races and backgrounds everywhere to stand up for their convictions.

---

[1] No party's counsel authored this brief in whole or in part; no party and no party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. Rule 29(c)(5)(a)-(c).

These three non-profit amici—who have each by its own internal decision-making process, exercised its authority to participate in the filing of this brief—state their interest in this case arises out of a need to voice the view that the civil rights of parties to same-sex relationships are not advanced by reliance on legal principles enunciated in *Loving v. Virginia*, 388 U.S. 1 (1967). principles that otherwise have served to further the civil rights of African-Americans. These amici believe the lower court's decision in *Kitchen v. Herbert*, No 2:13-cv-217 (D. Utah Dec. 20, 2013), improperly construes and improperly applies the legal principles enunciated in and the rationale of *Loving*.

All parties have consented to the filing of this brief. *See* Appellate Case No. 13-4178, Document No. 01019191743. Thus no motion for leave to file is required. *See* Fed. R. App. P. 29(a).

Respectfully submitted this 4th day of February 2014.

> s/  Stephen Kent Ehat
> Counsel of Record for Amici
> The Center for Urban Renewal and
> Education (CURE), Coalition of
> African American Pastors USA
> (CAAP) and The Frederick Douglass
> Foundation, Inc. (FDFI)

## SUMMARY OF ARGUMENT

"Marriage." What is it? And what State of the Union, as a condition of membership in the Union, ever ceded to the other States, or to any other State, its power to declare what does or does not constitute a marriage?

The Lovings were married in Washington, D.C. in June of 1958. Richard was a white caucasian; Mildred was African-American with Rappahannock Native American ancestry. She was pregnant. She and Richard wanted their child to have a mother and father who were married to one another. *It was legal for them to marry where they did*. They had traveled to the nation's capital to marry in order to evade the so-called Racial Integrity Act of 1924, enacted by the State of Virginia in its wayward effort to promote White Supremacy. Once the Lovings returned, *as a married couple*, to Virginia, they were charged with violation of Virginia's laws (1) forbidding interracial couples from marrying out of state and returning to Virginia and (2) forbidding the cohabitation of an interracial couple. It should be noted that *both* in Washington, D.C. *and* in Virginia, they were considered to be, and in fact were, *a married couple*. Even pursuant to the Virginia statutes under which they were prosecuted, it was their *marriage certificate* that was used as evidence against them, part of the proof that they were "cohabiting *as man and wife*," as the offended statute read (emphasis added). Indeed, though he would not attend the oral arguments in the Supreme Court of the United States

1

years later when his wife's and his case was argued there, Richard Loving had his counsel, Bernard S. Cohen, convey to the Court Richard's own personal message: "Mr. Cohen, tell the Court I love *my wife*, and it is just unfair that I can't live with her in Virginia." He used the words "my wife" with good reason. They were a married couple.

The Lovings, and their case, did not challenge the nature and meaning of marriage. As a married couple, the Lovings were a perfect model of marriage. But for their races and Virginia's laws, they otherwise could have contracted their marriage in Virginia or otherwise lawfully could have cohabited there as husband and wife. Indeed, notwithstanding the extraneous factor of race, they otherwise were considered, even in Virginia itself, to be *married* once they did marry. Race was a factor entirely extraneous to the existence of their marriage, entirely foreign to the concept of what their marriage was, what the definition of their marriage was, what the nature of their marriage was. But because in an effort to promote White Supremacy, Virginia had chosen to rely on race—a factor entirely extraneous to the concept, the definition, the existence of marriage—to declare which marriages otherwise it would recognize as valid and which ones it would criminalize, the Lovings, a married couple, were prosecuted and convicted.

But here, in this present case, the Loving story, the *Loving* case, does not quite apply. In *Loving*, but for the *races* of the parties and the Virginia statutes, the

two people could indeed contract marriage in Virginia. Indeed, even in light of the races of the parties, the Lovings were, indeed, considered in Virginia to be a married couple. Race was entirely extraneous to the existence of their marital relationship. Here, however, but for the *gender* of the parties, two people of the same sex otherwise cannot marry. The sex of the parties is not a factor entirely extraneous to the concept of marriage, to the definition of marriage, to the existence of a marriage; rather, the sex of the parties is central—essential—to the concept of marriage, central to the definition of marriage, central to the existence of marriage.

Upon accepting the obligation to govern itself and its people according to the compact requiring states to provide equal treatment of individuals, no state ever was required to relinquish its ability to acknowledge what never needed to be articulated, to recognize what previously never needed to be expressly defined: that marriage, by its very nature and therefore by its very definition, constitutes the union of one man and one woman. And that compact does not require any state to change its definition of marriage simply because another state or other states choose to change the definition within their jurisdictions. What state ceded to any other state or to all other states its power to define marriage? Do the activities of courts within and legislatures of the sixteen states that have declared that persons of the same sex may marry constitute binding law within the thirty states that have

3

not so declared it? The unmistakeable and very public activity both of the state and federal courts within the states and of the legislatures of those states makes abundantly clear and forcefully obvious that it is of the people within each of the states, and by the people within each of the states, and for the people within each of the states that the institution of marriage is and has been and should be defined.

Everything in *Loving* requires a state, in declaring who may marry whom, to *abandon* reliance on a factor extraneous to marriage (namely, the extraneous factor of race) and nothing in *Loving* requires a state, in declaring what a marriage is, to *ignore* reliance on a factor central to marriage (namely, the essential factor of gender). What is a "citizen"? Must a state recognize a non-citizen as a state citizen because to do otherwise could be considered to be unfair or unequal or the result of "animus"?

As amici with an intimate perspective on African-American issues, we here discuss what we view as the proper role that should be played by *Loving v. Virginia*, 388 U.S. 1 (1967), in addressing the same-sex marriage question. To this end, we here make reference to two categories of relationships: (1) a **gender-inclusive relationship** and (2) a **gender-exclusive relationship**. A gender-inclusive relationship, by definition, *includes* both sexes in the relationship, while a gender-exclusive relationship, by definition, *excludes* one of the sexes therefrom.

Under the miscegenation statutes invalidated in *Loving*, one person could not marry another because of a characteristic (race) wholly unrelated to the definition of the gender-inclusive relationship. And once the miscegenation statutes were invalidated, the gender-inclusive relationship definition survived. Prior to *Loving*, some states had denied to male-female interracial couples the ability to contract a marriage; after *Loving*, male-female interracial couples could marry in those states as in all states. *Loving* affirmed and preserved and protected the gender-inclusive relationship that is marriage.

Here, by way of contrast, the question of who may marry whom is answered not by reference to an irrelevant factor (race), but instead by reference to a most relevant—the most relevant—factor, namely, the sex of the parties to the relationship, a characteristic altogether *central* to the nature and existence of the gender-inclusive relationship. Under the statutes at risk of invalidation here, one person cannot marry another because of a characteristic (gender) that is centrally related to the definition of the gender-inclusive relationship. If the one-man, one-woman statutes are here invalidated, the gender-inclusive relationship definition does not survive. Here the issue concerns the definition of marriage as a gender-integrating union, not (as in *Loving*) the race of the male and female parties to a marriage, a relationship that constitutes a marriage regardless of the race of the parties.

5

In *Loving*, the invalidation of the miscegenation statutes left intact the gender-inclusive definition of marriage; here, the invalidation of one-man, one-woman legal provisions would not leave intact the gender-inclusive definition of marriage. *Loving* preserved the gender-inclusive definition of marriage. *Loving* does not at all provide authority or rationale for changing the definition of marriage from one that is a gender-inclusive institution to one that allows also for a gender-exclusive relationship. *Loving* is authority only for invalidation of legal provisions that considered as relevant a characteristic that actually was unrelated to the gender-inclusive relationship that defines marriage; *Loving* is not authority for the invalidation of legal provisions that consider to be relevant a characteristic central to the gender-inclusive relationship that defines marriage.

In *Loving* the High Court vindicated the nation's commitment to the core principles of the Fourteenth Amendment—that all races are equal before the law and that the government may not distinguish between citizens on the basis of race, principles that hundreds of thousands of Americans died to establish. On the other hand, the district court's Memorandum Decision and Order in the present case (Dkt. 90) holds that gender-exclusive relationships must be treated the same as gender-inclusive ones. However, such a result is not supported by the text, history, or purposes of the Fourteenth Amendment, has been rejected rather than accepted by national consensus, and is not at all forced by any principled reading of *Loving*.

The opposite-sex requirement for marriage is closely bound to the institution's core purpose of increasing the likelihood children will be born to and raised by both mother and father. Racial restrictions on marriage invalidated in *Loving* not only failed to serve this purpose, they actually contradicted and undermined this objective.

To redefine marriage and force the State of Utah to authorize same-sex marriages would profoundly alter the meaning of the institution which the Supreme Court protected in *Loving*. Ironically, to "expand" marriage by making it "genderless" would diminish both the social benefits it provides and the contributions the Supreme Court of the United States celebrated when it invalidated Virginia's antimiscegenation law.

The Memorandum Opinion and Order of the district court below first cites to *Loving* in support of the assertion that in *Loving* the Supreme Court of the United States had balanced "the state's right to regulate marriage against the individual's right to equal protection and due process under the law." (Dkt. 90 at 13.) Whereas in *Windsor*, said the court below, states' rights interests and individual rights interests were together "allied against the ability of the federal government to disregard a state law that protected individual rights" (*e.g.*, DOMA section 3 defined what is a marriage for federal purposes to the "disregard" of state laws that otherwise defined marriage to include same-sex couples), "here," said

the court below, "these interests directly oppose each other"; in cases such as *Loving*, "the Court has held that the Fourteenth Amendment requires that individual rights take precedence over states' rights where these two interests are in conflict." Consistent with a desire to agree with the assessment of *Windsor* adopted by dissenting Justice Antonin Scalia, the court below found "that the important federalism concerns at issue here are nevertheless insufficient to save a state-law prohibition that denies the Plaintiffs their rights to due process and equal protection under the law." The court below quotes Justice Scalia: "DOMA is motivated by 'bare . . . desire to harm.'" Yet, while claiming to have discussed the history of Utah's Section 30-1-2 and Amendment 3 "in the context of the *ongoing national debate* surrounding same-sex marriage" (Dkt. 90 at 7, emphasis added), the court below makes only passing (but correct) reference to the fact that it was in *1977* (thirty-seven years ago[2]) that "the Utah legislature amended Section 30-1-2 of the Utah Code to state that marriages 'between persons of the same sex' were 'prohibited and declared void.'" This hardly justifies even Justice Scalia's assessment that laws limiting marriage to opposite-sex couples are "motivated by 'bare . . . desire to harm' couples in same-sex marriages," for in 1977 there were no "same-sex marriages" to harm.

---

[2] *See Laws of the State of Utah, 1977*, available at http://snipurl.com/ 28iyyrp, at pp. 1-2, last viewed on February 3, 2014.

The court below attempts in three places in its Memorandum Opinion and Order to justify its assertion that *Loving* is "analogous" to the present case. *See* Dkt. 90 at pages 20-21, 28, and 35. As will be shown below, *Loving* is far from analogous. Here the issue concerns the definition of marriage as a gender-integrating union, not (as in *Loving*) the race of the male and female parties to a marriage, a relationship that constitutes a marriage regardless of the race of the parties. *Loving* requires a state to abandon reliance on race, a factor extraneous to marriage, but does not require a state to ignore gender, a factor central to marriage.

**ARGUMENT**

**I.**

**UNLIKE THE OPPOSITE-SEX DEFINITION OF MARRIAGE, RACIAL RESTRICTIONS ON MARRIAGE IMPLICATED THE FOURTEENTH AMENDMENT'S CORE CONCERN WITH ELIMINATING RACIAL DISCRIMINATION**

The decision of the United States District Court for the District of Utah invalidating provisions of the laws of the State of Utah and mandating by judicial fiat the legalization of same-sex marriage in that state, is fundamentally inconsistent with the decision of the United States Supreme Court in *Loving v. Virginia*, 388 U.S. 1 (1967).

"[T]he historical fact [is] that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964). In *Loving* the High Court reiterated: "The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." 388 U.S. at 10. In *Loving* the Court concluded that the Virginia anti-miscegenation law was "designed to maintain White Supremacy." 388 U.S. at 11. Such racially discriminatory purpose triggers strict scrutiny, even if the law appears to be facially neutral. *See Washington v. Davis*, 426 U.S. 229, 241-242 (1976). "The striking reference [in *Loving*] to White Supremacy—by a unanimous Court, capitalizing both words, and speaking in

these terms for the only time in the nation's history,"[3] underscores the centrality of the *Loving* Court's concern about racial discrimination. *Loving* stands for the rejection of racial discrimination in marriage law (not for the judicial mandate of same-sex marriage). *See generally Bartlett v. Strickland*, 556 U.S. 1, 23-24 (2009); *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007); *Johnson v. California*, 545 U.S. 162, 170 (2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Grutter v. Bollinger*, 539 U.S. 306 (2003).

Race is not fundamental to either marriage or procreation. *See Loving*, 388 U.S. at 11 ("There is patently no legitimate overriding purpose independent of invidious discrimination [for the anti-miscegenation law]"); *see also McLaughlin*, *supra*, 379 U.S. at 193 ("There is no suggestion that a white person and a Negro are any more likely habitually . . . than the white or the Negro couple . . . to engage in illicit intercourse . . . .")

This fundamental distinction lies at the heart of the point that Yale Law Professor Stephen L. Carter made on the thirtieth anniversary of *Loving*. He wrote: "One of the beauties of *Loving v. Virginia* was precisely that it was very easy to see how these were people trying to do a very ordinary thing, and got in trouble

---

[3] *See* Cass R. Sunstein, *Homosexuality and the Constitution*, 70 IND. L.J. 1, 17-18 (1994).

for it."[4] It is here *extra*ordinary to seek to *redefine the institution of marriage*.[5]

## II.

### IN AMERICAN LEGAL HISTORY, RACIALLY SEGREGATED MARRIAGE IS NOT COMPARABLE TO SEXUALLY INTEGRATED MARRIAGE

The effect of a decision in this court mandating a redefinition of marriage to include same-sex couples would be revolutionary and dramatically different from the effect of the decision in *Loving*. Unlike the opposite-sex requisite for marriage, racial restrictions on marriage never were a universal, defining feature of marriage.

For example, interracial marriage was legal at common law, and in six of the thirteen original States—Connecticut, New Hampshire, New Jersey, New York, Pennsylvania, and Rhode Island—at the time the U.S. Constitution was adopted. Five of these original States (all but Rhode Island), plus the next one to join the Union (Vermont, in 1791), never enacted anti-miscegenation laws. The same is true of several of the States subsequently admitted to the Union.[6]

---

[4] Stephen L. Carter, *"Defending" Marriage: A Modest Proposal*, 41 HOW. L. J. 215, 227 (1997) (emphasis added).

[5] Lynn D. Wardle & Lincoln C. Oliphant, In Praise of Loving: *Reflections on the* "Loving *Analogy" for Same-Sex Marriage*, 51 HOW. L. J. 117, 147 (2007). *See also* Stephen Carter, *supra* note 4.

[6] Wardle & Oliphant, *supra* note 5, at 165. *See also* Peter Wallenstein, TELL THE COURT I LOVE MY WIFE: RACE, MARRIAGE, AND LAW—AN AMERICAN HISTORY 253-54 (Appendix I) (2002). Wallenstein acknowledges his data differ in detail from others', but the historical picture is consistent.

Some States which did have anti-miscegenation statutes abandoned them in the wake of the adoption of the Fourteenth Amendment.[7] By the time *Loving* was decided in 1967, anti-miscegenation provisions were rapidly disappearing from state constitutions and statutes and remained in force in only sixteen states (all in a single region of the country). *See* 388 U.S. 1, 6 n. 5 (1967).[8]

The American people in most states, including the people of Utah, have sought to defend the institution of sexually integrated, male-female marriage. The cumulative vote to ban gender-exclusive marriage is well over 60% nationwide.

---

[7] *See Hart v. Hoss & Elder*, 26 La. Ann. 90 (1874) (holding that the Civil Rights Act of 1866 invalidated anti-miscegenation law); *Burns v. State*, 48 Ala. 195, 198-199 (1872) (holding that the Fourteenth Amendment invalidated anti-miscegenation law); Charles Frank Robinson, DANGEROUS LIAISONS 29-30 (2006) (noting that in 1874 Arkansas omitted its anti-miscegenation law from its revised civil code; that in 1868 "South Carolina implicitly abrogated its intermarriage law by adopting a constitutional provision that 'distinctions on account of race or color in any case whatever, shall be prohibited, and all class of citizens shall enjoy all common, public, legal and political privileges'. . ."; that in 1871 Mississippi omitted its anti-miscegenation law from its revised civil code; and that in 1868 the Louisiana legislature repealed that state's anti-miscegenation law); Wardle & Oliphant, *supra* n. 8, at 180 (noting that the Illinois legislature repealed its anti-miscegenation law in 1874); Peter Wallenstein, *Law and the Boundaries of Place and Race in Interracial Marriage: Interstate Comity, Racial Identity, and Miscegenation Laws in North Carolina, South Carolina, and Virginia, 1860s-1960s*, 32 AKRON L. REV. 557, 558 & 561 (1999) (noting that after 1868 South Carolina had a "temporary tolerance of interracial marriage" … that "attracted interracial couples from a … neighboring state … ").

[8] As the Supreme Court explained in *Loving*, fourteen States had repealed their bans on interracial marriage in the fifteen years leading up to the *Loving* decision. *Id.*

13

Of the twenty-eight States "voting blue" (for Obama) in the 2008 presidential election, twenty-three protected male-female, gender-inclusive marriage. Any claim that those States are motivated by animus is merely a slander on the American people. This broad movement to protect conjugal marriage helps identify the contours of equal protection, liberty, privacy, and due process in marriage law.

A similar pattern of rejecting gender-exclusive marriage exists globally: only fourteen of 193 sovereign nations permit same-sex marriage,[9] and another eleven nations have created marriage-equivalent civil unions for same-sex couples[10]; while nearly twice as many nations (at least 47[11]) have constitutional

---

[9] The Netherlands (2001), Belgium (2003), Canada (2005), Spain (2005), South Africa (2006 allows "civil unions" created by "marriages" under Marriage Act that still allows only male-female marriage), Norway (2009), Sweden (2009), Portugal (2010), Iceland (2010), Argentina (2010), Denmark (2012), Uruguay (2013), New Zealand (2013), France (2013), Brazil (2013, in 10 of 26 states with directive of National Judicial Council unclear), England/Wales (2014).

[10] Ecuador, Finland, Germany, Luxembourg, Slovenia, Andorra, Switzerland, Australia, Austria, Ireland, Liechtenstein.

[11] Armenia (art. 32), Azerbaijan (art. 34), Belarus (art. 32), Bolivia (art. 63), Brazil (art. 226), Bulgaria (art. 46), Burkina Faso (art. 23), Burundi (art. 29), Cambodia (art. 45), China (art. 49), Columbia (art. 42), Croatia (art. 61, Dec. 2013) Cuba (art. 43), Democratic Republic of Congo (art. 40), Ecuador (art. 38), Eritrea (art. 22), Ethiopia (art. 34), Gambia (art. 27), Honduras (art. 112), Hungary (art. M, Constitution/Basic Law of Hungary (25 April 2011) (effective Jan. 2012); Japan (art. 24), Latvia (art. 110 - Dec. 2005), Lithuania (art. 31), Malawi (art. 22), Moldova (art. 48), Mongolia (art. 16), Montenegro (art. 71), Namibia (art. 14), Nicaragua (art. 72), (Panama (art. 58), Paraguay (arts. 49, 51, 52), Peru (art. 5),

14

provisions that appear to define marriage as the union of a man and a woman.)

In *Lawrence v. Texas*, 539 U.S. 558, 568 et seq. (2003), the Supreme Court of the United States reviewed the history of the relevant laws and stated, "In all events we think that our laws and traditions in the past half century are of most relevance." *Id.* at 571-72. Let that same standard now be applied to the dual-gender marriage laws of Utah (and nearly all other states), which indeed are ancient and venerable, and also fresh, vigorous, and comprehensive.

## III.

### THE GENDER-INTEGRATING DEFINITION OF MARRIAGE IS CLOSELY BOUND UP WITH THE INSTITUTION'S CORE PURPOSE OF INCREASING THE LIKELIHOOD THAT EACH CHILD WILL BE BORN TO AND RAISED BY BOTH THE MOTHER AND THE FATHER IN A STABLE, ENDURING FAMILY UNIT

The definition of marriage as the union of man and woman is essential to the core social purposes of marriage. Because men and women differ in significant ways relevant to the social purposes of marriage, the integration of their complementary differences creates a unique relationship of unique value to society. This sexually integrated, complementary institution furthers social functions that are essential to the welfare of the family, the state, and its citizens,

---

Poland (art. 18), Romania (art. 44), Rwanda (art. 26), Serbia (art. 62), Seychelles (art. 32), Somalia (art. 2.7, draft Constitution 2012); Sudan (art. 15), Suriname (art. 35), Swaziland Constitution (art. 27), Tajikistan (art. 33), Turkmenistan (art. 25), Uganda (art. 31), Ukraine (ark. 51), Venezuela (art. 77), Vietnam (art. 64). (At least 12 of these imply dual-gender ("men and women have/may").)

and particularly makes critical contributions to child welfare. Nothing in *Loving* even remotely serves to undermine these functions; rather, *Loving* indeed sought to further them.

Three of the important public purposes of marriage—to protect and promote the social interests in safe sex, responsible procreation, and optimal child rearing —are closely linked in our laws and social policies, just as they are closely linked in life. They are linked by human nature—"the ties of nature" as Blackstone put it.[12] Human nature, however, is imperfect, and those ties are imperfect ties, which is why society attempts to reinforce them through marriage law.

Both textually and structurally, precedent of the Supreme Court of the United States repeatedly and clearly links marriage with gender-integration, and especially to society's interest in the institution that fosters responsible sexuality, procreation, and child rearing. *Loving* concerned a law which fought against the marriage of Richard and Mildred Loving, whose marriage was a classic example of the sort of loving relationship between a man and a woman which sought to sustain and further that linkage. Invocation of *Loving* to attempt to justify judicially-mandated same-sex marriage is both ironic and futile.

---

[12] I William Blackstone, Commentaries on the Laws of England *458. *See also In re G Children* (FC) [2006] UKHL 43 at ¶¶ 33-35, available at http://www.publications.parliament.uk/pa/ld200506/ldjudgmt/jd060726/child-1.htm (last see on February 3, 2014), discussing benefits of genetic and gestational parenthood.

In *Loving* itself, the Supreme Court of the United States cited four prior Supreme Court decisions dealing with or discussing marriage, and all of them noted or involved some aspect of the role of gender-inclusive marriage in furthering state interests in responsible sexuality, procreation or child rearing:

*Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) involved an appeal of the conviction of a private parochial school teacher, acting as the educational agent of the parents, for teaching in the German language. The Court declared that the "liberty" protected by the Fourteenth Amendment includes "the right of the individual . . . *to marry, establish a home and bring up children . . . .*" (emphasis added).

*Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), involved a challenge to a criminal sterilization act. The Court declared: "*Marriage and procreation are fundamental to the very existence and survival of the race*" (emphasis added).

*McLaughlin v. Florida*, 379 U.S. 184 (1964), was an appeal from a conviction for violation of a state's criminal interracial cohabitation law. The High Court noted: "[W]e see no reason to quarrel with the State's characterization of this statute, dealing as it does with *illicit extramarital and premarital promiscuity*" (emphasis added). Florida invoked its law against interracial marriage, arguing that just as it was presumably constitutional, so also was the challenged law against interracial cohabitation constitutional. But the Supreme Court rejected that

analogy "without reaching the question of the validity of the State's prohibition against interracial marriage or the soundness of the arguments rooted in the history of the Amendment," *id.*, because race-neutral laws prohibiting cohabitation adequately "protect the integrity of the marriage laws of the State."

Finally, *Maynard v. Hill*, 125 U.S. 190, 205 (1880) involved a claim to homestead land by the children of a marriage that had been dissolved *ex parte* by legislative act of the territorial legislature during the pendency of the homestead settlement and claim, while the unsuspecting wife and children had been left in a distant state. The High Court described "[m]arriage, as creating *the most important relation in life, as having more to do with the morals and civilization of a people than any other institution* . . . ." Moreover, it declared that marriage "is an institution, in the maintenance of which in its purity the public is deeply interested, for *it is the foundation of the family and of society*, without which there would be neither civilization nor progress." *Id.* at 209-210 (all emphases added).

In short, "marriage," as addressed by *Loving*, was clearly understood to be a gender-inclusive institution. Numerous other decisions by the Supreme Court of the United States link protection of marriage to its role as the institutional regulator of, and environment for, the safest male-female sexual intimacy, procreation and child rearing. *See Griswold v. Connecticut*, 381 U.S. 479, 495 (1965) (Goldberg, concurring) ("The entire fabric of the Constitution and the

purposes that clearly underlie its specific guarantees demonstrate that the rights to marital privacy and to marry and raise a family are of similar order and magnitude as the fundamental rights specifically protected"); *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) ("As this Court on more than one occasion has recognized, marriage involves interests of basic importance in our society"); *id.* at 389-90 (Black, J., dissenting) ("The institution of marriage is of peculiar importance to the people of the States. It is within the States that they live and vote and rear their children . . ."); *Roe v. Wade*, 410 U.S. 113, 152-53 (1973) (the constitutional right of privacy "has some extension to activities relating to marriage . . . [*i.e.*,] procreation, . . . contraception, child rearing . . ."); *Zablocki v. Redhail*, 434 U.S. 374, 386 (1978) ("It is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. As the facts of this case illustrate, it would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society. . . . Surely, a decision to marry and raise the child in a traditional family setting must receive equivalent protection.") *See also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65 (linking as fundamental rights protected by "privacy" "the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing"); *Carey v. Populations*

*Services International*, 431 U.S. 678, 685 (1977) (constitutionally protected
"decisions that an individual may make without unjustified government
interference are personal decisions 'relating to marriage, . . . procreation, . . .
contraception, . . . family relationships, . . . and child rearing and education. . . .'").
Indeed, in all of the Supreme Court decisions about constitutional doctrines
pertaining to marriage, "the right to marry is directly linked with responsible
procreation and child rearing."[13] All of these High Court statements were made
within the unquestioned context of marriage as a gender-inclusive institution.

The very facts of *Loving* underscore the connection of marriage to
procreation and child rearing. Richard and Mildred Loving had three children; yet
Richard could only visit his wife and act as a parent to his and Mildred's
biological children in Virginia under cover of darkness because of Virginia's
anti-miscegenation law.[14] The Lovings treasured their children.[15] In no small part,
the Lovings challenged the Virginia anti-miscegenation law for the sake of their

---

[13] Lynn D. Wardle, *Loving v. Virginia and The Constitutional Right to Marry*, 1790-1990, 41 HOW. L. J. 289, 338 (1998).

[14] Robert A. Pratt, *Crossing the Color Line: A Historical Assessment and Personal Narrative of* Loving v. Virginia, 41 HOW. L.J. 229, 229-30 (1998).

[15] *Id.* at 243 ("The first thing that one notices upon entering Mildred Loving's home are the pictures of her children and grandchildren that adorn her walls"); *id.* at 244 ("She is proud of her children and is delighted that they all live close by").

children. After their conviction for violating the Virginia anti-miscegenation laws, they were forced to move to the District of Columbia; but as a family from rural Virginia, they were never happy there. As Mildred Loving said: "I wanted my children to grow up in the country, where they could run and play, and where I wouldn't worry about them so much."[16] So to overturn the law that prevented her family from living together in rural Virginia, she wrote a letter to U.S. Attorney General Robert Kennedy, whose office referred it to the ACLU, which referred it to two young Virginia lawyers, Bernard S. Cohen and Philip J. Hirschkop, who filed the case that became legal history.

In stark contrast to the impact of *Loving*, it is not at all yet clear whether the social impact of legalizing same-sex marriage will or will not diminish the well-being of children generally.[17] The district court below states that the ability to procreate "is not a defining characteristic of conjugal relationships from a legal and constitutional point of view" and that linkage of marriage to procreation "demeans the dignity not just of same-sex couples, but of the many opposite-sex

---

[16] *Id*. at 237.

[17] The impact upon children of being raised in various family environments is highly controversial and sharply contested, for obvious reasons. Those social science disputes should be debated by those skilled in the disciplines and the policy issues should be decided by the elected representatives of the people in the legislatures. Those matters are neither before the Court now nor appropriate for judicial resolution.

couples who are unable to reproduce or who choose not to have children." Dkt. 90 at 26. Of course, same-sex couples are incapable of procreation. And of course, there are other exceptions: some same-sex couples will rear children, many will not; most gender-inclusive couples will reproduce, some will not. But the rule should not be established by reference to the exceptions and it is the *institution* itself, not the details of exceptional cases participating in it, that is at issue. Should society acknowledge and give some sort of preference to that one institution that is unique? Is there any institution where a child can be reared by both of the persons who were responsible for bringing that child into the world and can look to those two persons as they strive to complement one another and model *both* of the sexes rather than exclude one of the sexes from the parental example? If so, should society recognize that institution as unique? Conferring the status of marriage on same-sex couples will send a clear social and legal message further disconnecting marriage from child rearing.

One might suppose the following: Suppose that all states, all countries, all peoples recognized gender-exclusive relationships as meriting the status of a marriage. What then? Were this court, or any court, then to sit as a super-legislature or queen or king, as it were, and decide whether any institution merited special recognition and preference for a unique value it offered and delivered to society, what institution would that lawmaker choose? Why?

## IV.

### THE DUAL-GENDER REQUIREMENT FOR MARRIAGE SUBSTANTIALLY ADVANCES THE STATE'S INTEREST IN LINKING RESPONSIBLE PROCREATION, ADVANTAGEOUS CHILDBIRTH AND OPTIMAL CHILD REARING

Unlike in *Loving*, where there was no justification for Virginia's anti-miscegenation laws, here there are very compelling justifications for male-female marriage. Unlike Virginia's racist and irrelevant-to-marriage attempted justifications for the anti-miscegenation law invalidated in *Loving*, the State of Utah has profound, real, justifiable, and justified interests in protecting and preserving dual-gender marriage. Society generally has a compelling interest in preserving the institution that best advances the social interests in responsible procreation and that connects procreation to responsible child rearing. Gender-integrating marriage best promotes state interests in linking responsible procreation with child rearing, in connecting parents to offspring, in perpetuating the human race and survival of the species, and in furthering public health and child welfare.

Gender-integrating marriage promotes childbirth and thus the perpetuation of the species. This is a matter of special concern at present, since few developed nations in the world today have replacement birthrates (the U.S. is one—barely—and its birthrate has recently been falling). In Europe, a "demographic winter" is quickly descending: a phenomenon which British historian Niall Ferguson calls

23

"the greatest sustained reduction in European population since the Black Death of

the 14th Century."[18]

> Indeed, implicit in the very word matrimony is the idea that a man
> and a woman unite in legal marriage, *in matrimonium ducere*, so that
> they may have children. Plato proposed that "marriage laws [be] first
> laid down" and that "a penalty of fines and dishonor" be imposed
> upon all who did not marry by certain ages because "intercourse and
> partnership between married spouses [is] the original cause of
> childbirths." Likewise, Aristotle recommended that marriage
> regulations would be the first type of legislation "[s]ince the legislator
> should begin by considering how the frames of the children whom he
> is rearing may be as good as possible . . . ."[19]

---

[18] Niall Ferguson, "Eurabia?", N.Y. Times Magazine, April 4, 2004, available at http://www.nytimes.com/2004/04/04/magazine/04WWL N .html (seen December 26, 2012). The Organization for Economic Cooperation and Development reports that none of the nations of Europe can maintain their population (necessary for economic sustainability) through births, that only France, (with a birth rate of 1.8) has the possibility to do so; and that the fall in fertility in Eastern Europe has been precipitous. EUROPEAN BIRTH RATES REACH HISTORIC LOW IN PART BECAUSE OF RECENT FALL IN EASTERN EUROPE, Sept. 8, 2006, ¶1, available at www.medicalnewstoday.com/releases/51329.php (last seen on February 3, 2014). In fifteen European nations the rate of fertility is 1.3 or below, and a birthrate of 1.4 or 1.5 means that the population will decrease by one-third each generation; in some European nations births are down to about one-half the replacement level (of 2.1 births per couple). *Id. See further* George Weigel, THE CUBE AND THE CATHEDRAL: EUROPE, AMERICA AND POLITICS WITHOUT GOD 21 (2005)

[19] Lynn D. Wardle, *"Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation*, 24 HARV. J. L. & PUB. POLICY 771, 784-5 (2001). *Id.* at 785 ("Procreation is the social interest underlying Rousseau's declaration that: 'Marriage ... being a civil contract, has civil consequences without which it would be impossible for society itself to subsist.' Locke agreed, and linked 'the increase of Mankind, and the continuation of the Species in the highest perfection,' with 'the security of the Marriage Bed, as necessary thereunto.'").

Marriage between mother and father strengthens the bond of parents to their offspring. "Same-sex marriage puts in jeopardy the rights of children to know and experience their genetic heritage in their lives and withdraws society's recognition of its importance to them, their wider family, and society itself."[20] Gender-integrating marriage enhances the "belonging" in marriage which benefits not only the married couple but their children.

## V.

### A KEY PURPOSE OF *LOVING* WAS TO DISENTANGLE MARRIAGE FROM RESTRAINTS IMPOSED BY PERSONS PURSUING POLICIES EXTRANEOUS TO MARRIAGE

When *Loving* was decided, only six states had anti-miscegenation provisions in their constitutions and no state in the Union had enacted such a law since 1913. Those race-based marriage laws were "designed to maintain White Supremacy," *id.* at 11, and, as the Supreme Court held, they were an affront to the Fourteenth Amendment. "The clear and central purpose of the Fourteenth Amendment," the High Court wrote in *Loving*, "was to eliminate all official state sources of invidious racial discrimination in the States." *Id.* at 10.

---

[20] George W. Dent, Jr., *Straight Is Better: Why Law and Society May Legitimately Prefer Heterosexuality*, TEX. REV. L. & POLITICS (2010) at 11, available at http://ssrn.com/abstract=1649574 (last seen February 3, 2014), summarizing some gender differences (quoting Professor Margaret Somerville).

25

Racial eugenicists in Virginia used anti-miscegenation provisions to commandeer marriage in order to promote the social reform ideology and policy goals of White Supremacy. *See Loving*, 388 U.S. at 6, 11. White Supremacists usurped marriage (as it had been known at common law and globally for millennia) seeking to promote an extraneous social policy. *Loving* was about racism. *Fisher v. Univ. of Texas*, 133 S.Ct. 2411, 2419 (2013). This case is about whether society generally, and Utah specifically, should and must adopt and further a policy extraneous to marriage—the validation of gender-exclusive relationships.

*Loving* can be distinguished from the current dispute over same-sex marriage. Laws against miscegenation were designed to segregate the races, reinforcing the socially disadvantaged position of African-Americans. *Loving*, 388 U.S. at 11 (stating that laws were "designed to maintain White Supremacy"). By contrast, the traditional definition of marriage calls for mixing of the genders— integration, not segregation—and therefore cannot be understood as an attempt to disadvantage either gender.

26

## VI.

### JUST FIVE YEARS AFTER DECIDING LOVING THIS COURT IN *BAKER V. NELSON* REJECTED THE CLAIM THAT STATE LAW ALLOWING ONLY DUAL-GENDER MARRIAGE VIOLATED *LOVING*; *BAKER* IS GOOD LAW, BINDING PRECEDENT AND OUGHT TO BE FOLLOWED

No Supreme Court case has supplanted or even modified the result in *Baker v. Nelson,* 409 U.S. 810 (1972), *dismissing for want of a substantial federal question the appeal in Baker v. Nelson*, 91 N.W.2d 185 (Minn. 1971). That case remains conclusive on the subject of same-sex marriage under the U.S. Constitution. A number of lower-court decisions analyze the precedential effect of *Baker*. *See, e.g., Wilson v. Ake*, 354 F. Supp. 2d 1298, 1305 (court sees no "reason to believe that the [*Baker*] holding is invalid today"); *Gill v. Office of Personnel Management*, 682 F. 3d 1 (1st Cir. 2012) (*Baker* "is precedent binding on us" and "limit[s] the arguments to ones that do not presume or rest on a constitutional right to same-sex marriage."); *Jackson v. Abercrombie*, 2012 U.S. Dist. LEXIS 111376, *44-*55 (U.S. Dist. Haw., Aug. 8, 2012) (*Baker* "necessarily decided that a state law defining marriage as a union between a man and woman does not violate the Equal Protection Clause"; "[t]he issue did not merely 'lurk in the record,' but was directly before the Supreme Court"; "*Baker* is the last word from the Supreme Court regarding the constitutionality of a state law limiting marriage to opposite-sex couples and thus remains binding on this Court"); *Sevcik v.*

*Sandoval*, 2012 U.S. Dist. LEXIS 169643, *15-*20 (U.S.Dist. Nevada, Nov. 26, 2012) ("*Baker* controls the present case, unless the specific challenge presented in this case was not decided by the Minnesota Supreme Court"). *But see Windsor v. United States*, 699 F. 3d 169, 176 & 178-179 (2d Cir., 2012) ("Windsor's suit is not foreclosed by *Baker*"). Insofar as any subsequent case raises the same issues—as this case does—the Supreme Court of the United States already has spoken, and at least the lower courts are bound by its determination.

The court below in this present case (*Kitchen v. Herbert*) states that it is "notable that while the [Supreme] Court declined to reach the merits in *Perry v. Hollingsworth* because the petitioners lacked standing to pursue the appeal, *the Court did not dismiss the case outright for lack of a substantial federal question*." Dkt. 90 at 16 (emphasis added). Such reasoning ignores the fact that the High Court in *Perry* vacated the judgment of the Ninth Circuit and remanded the case "with instructions to dismiss the appeal *for lack of jurisdiction*." Not only was the High Court not at all in a position to "reach the merits" in *Perry* it was also not in a position to "dismiss the case outright for lack of a substantial federal question" as the district court below otherwise notes, for the High Court in *Perry* had *no jurisdiction* to dismiss the appeal in *Perry*, having jurisdiction only to order the lower court to dismiss, for lack of jurisdiction, thus unable to comment on the merits of whether the case did or did not present a substantial federal question.

28

Although the district court below attempts to interpose the "doctrinal developments" exception to the otherwise applicable precedential effect of the High Court's *Baker* decision, it thus clearly confuses doctrinal developments pertaining to sexual relations between consenting adults (Dkt. 90 at p. 14) with attempted definitional tinkering with what a marriage is. As shown in earlier sections of this brief, no doctrines regarding the institution of marriage have been changed since *Baker*; rather, only attempts to expand the definition of marriage beyond its breaking point have been introduced (mostly in the courts, and mostly having been rejected by the people and their elected representatives).

## VII.

### CONCLUSION: LOVING COMPELS REVERSAL

Wherefore, these amici respectfully submit that the decision of the United States District Court for the District of Utah invalidating provisions of the laws of the State of Utah and mandating by judicial fiat the legalization of same-sex marriage in that state, is fundamentally inconsistent with the decision of the United States Supreme Court in *Loving v. Virginia*, 388 U.S. 1 (1967). This court should reverse the district court.

Respectfully submitted this 4th day of February 2014.

s/  Stephen Kent Ehat
Counsel of Record for Amici
CURE, CAAP, and FDFI

## STATEMENT OF RELATED CASE

Although 10th Cir. R. 28.2(C)(1) requires the *parties* not these amici to list

(at the end of the table of cases) all prior or related appeals, with appropriate

citations, because these present amici (The Coalition of African American Pastors

USA (CAAP), The Center for Urban Renewal and Education (CURE) and The

Frederick Douglass Foundation, Inc. (FDFI)) intend to file and serve a separate

amicus brief in a separate but related appeal and cross-appeal and therein address

issues arising out of unique treatment of *Loving v. Virginia*, 388 U.S. 1 (1967) by

the United States District Court for the District of Oklahoma, these amici here

state that there is a related appeal pending in this court, *Bishop v. Smith*, Tenth Cir.

No. 13-5003 and No. 13-4178, which arises out of a federal district court in

Oklahoma.

Dated: February 4, 2014

s/  Stephen Kent Ehat
Counsel of Record for Amici
The Center for Urban Renewal and
Education (CURE), Coalition of
African American Pastors USA
(CAAP) and The Frederick Douglass
Foundation, Inc. (FDFI)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

■      this brief contains 6,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

☐      this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

■      this brief has been prepared in a proportionally spaced typeface using the Microsoft Word word processing program and the Times New Roman 14 point font, or

☐      this brief has been prepared in a monospaced spaced typeface  using (state name and version of word processing program) _____ with (state number of characters per inch and name of type  style) _____.


Signature:          s/ Stephen Kent Ehat_____

Attorney for:       Amici Curiae The Coalition of African American Pastors USA, The Frederick Douglass Foundation, Inc. and The Center for Urban Renewal and Education

Date:               February 4, 2014

## ECF CERTIFICATIONS

Pursuant to Section II(I) of the Court's CM/ECF User's Manual, the undersigned certifies that:

1. all required privacy redactions have been made pursuant to Rule 25.5 of the Tenth Circuit Rules;

2. hard copies of the foregoing motion required to be submitted to the clerk's office are exact copies of the brief as filed via ECF; and

3. the document filed via ECF was scanned for viruses with the most recent version of Microsoft Security Essentials, Antimalware Client Version: 4.4.304.0; Engine Version: 1.1.10201.0; Antivirus definition: 1.165.3064.0; Antispyware definition: 1.165.3064.0; Network Inspection System Engine Version: 2.1.10003.0; and Network Inspection System Definition Version: 109.107.0.0, and according to the program is free of viruses.

Dated this 4th day of February 2014.

s/  Stephen Kent Ehat
Counsel of Record for Amici
The Center for Urban Renewal and Education (CURE), Coalition of African American Pastors USA (CAAP) and The Frederick Douglass Foundation, Inc. (FDFI)

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th of February 2014, a true, correct and complete copy of the foregoing BRIEF OF AMICI CURIAE THE CENTER FOR URBAN RENEWAL AND EDUCATION, THE COALITION OF AFRICAN-AMERICAN PASTORS USA, AND THE FREDERICK DOUGLASS FOUNDATION, INC., SUPPORTING THE DEFENDANTS-APPELLANTS GARY R. HERBERT AND SEAN REYES IN FAVOR OF REVERSAL was filed with the Court and served on the following via the Court's ECF system:

GENE SCHAERR                           gschaerr@utah.gov
Special Assistant Utah
Attorney General
P.O. Box 140856
160 East 300 South, sixth floor
Salt Lake City, Utah 84114-0856

Peggy A. Tomsic                        tomsic@mgplaw.com
James E. Magleby                       magleby@mgplaw.com
Jennifer Fraser Parrish                parrish@mgplaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, UT 84101

Kathryn D. Kendell                     kkendall@nclrights.org
Shannon P. Minter                      sminter@nclrights.org
David C. Codell                        dcodell@nclrights.org
National Center for Lesbian Rights
870 Market St., Ste. 370
San Francisco, CA 94102

Ralph Chamness                         rchamness@slco.org
Darcy M. Goddard                       dgoddard@slco.org
Salt Lake County District Attorneys
2001 South State, S3700
Salt Lake City, UT 84190

                                       s/  Stephen Kent Ehat
                                       Counsel of Record for Amici
                                       The Center for Urban Renewal and
                                       Education (CURE), Coalition of
                                       African American Pastors USA
                                       (CAAP) and The Frederick Douglass
                                       Foundation, Inc. (FDFI)